**SIERRA CLUB and Defenders of Wildlife, Plaintiffs,**

**v.**

**William P. CLARK as Secretary of the Interior[1] and The Department of Interior, Defendants.**

---

**1.** William P. Clark was sworn in to succeed James G. Watt as Secretary of the Interior on November 21, 1983. Under Fed.R.Civ.P. 25(d), Secretary Clark is automatically substituted as defendant for Mr. Watt.

The **FUND FOR ANIMALS, INC.**, Friends of Animals and Their Environment (FATE), Wild Canid Research and Survival Center, Wildlife Education Program for a Living Future, North American Wildlife Park Foundation, Inc., Sierra Club, Help Our Wolves Live, Inc., International Fund for Animal Welfare, Defenders of Wildlife, Animal Welfare Institute, Humane Society of the United States, Friends of the Boundary Waters Wilderness, International Ecology Society, Animal Rights Coalition, and National Audubon Society, Plaintiffs,

v.

William P. **CLARK** as Secretary of the Interior, G. Ray Arnett as Assistant Secretary for Fish and Wildlife and Parks, Robert A. Jantzen as Director, United States Fish and Wildlife Service, Harvey K. Nelson as Regional Director, United States Fish and Wildlife Service, The Department of Interior and The United States of America, Defendants.

Nos. Civ. 5–83–254, 5–78–66.

United States District Court,
D. Minnesota,
Fifth Division.

Jan. 5, 1984.

Brian B. O'Neill, Steven C. Schroer and Amy B. Bromberg, Minneapolis, Minn., for plaintiffs.

James M. Rosenbaum, U.S. Atty. by Jon M. Hopeman, Asst. U.S. Atty., Minneapolis, Minn., for defendants.

MILES W. LORD, Chief Judge.

Much controversy has arisen in past years concerning the survival and prosperity of the Eastern Timber Wolf in northern Minnesota. This case is no exception. Plaintiffs, groups of conservation-minded citizens, have filed suit to prevent the implementation of new government regulations which would permit, among other things, a limited sport season on the wolf. However, the Eastern Timber Wolf, as a threatened species, enjoys protection under the Endangered Species Act, under which Congress has prohibited the public hunting of a threatened species except in the extraordinary case where population pressures within the animal's ecosystem cannot otherwise be relieved. In this case, the government has failed to make even the slightest showing that the wolf has exceeded the population limits of its ecosystem. For that reason, as set forth more fully below, the new regulations allowing a sport season are found to be illegal.

I

The Endangered Species Act of 1973 (the Act), 16 U.S.C. § 1531 *et seq.*, was enacted "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, to provide a program for the conservation of such endangered and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section." 16 U.S.C. § 1531(b). Under the Act, the Secretary of the Interior is given authority to determine which species are to be classified as "endangered" or "threatened" according to certain criteria. *See* 16 U.S.C. § 1533(a). An endangered species is defined as "any species which is in danger of extinction...." 16 U.S.C. § 1532(4). The definition given to a threatened species is "any species which is likely to become an endangered species within the foreseeable future...." 16 U.S.C. § 1532(15).

The Eastern Timber Wolf once roamed throughout the length and breadth of America. The wolf now occupies only 1 percent of its original range, which for all practical purposes is confined to only a half dozen counties in northern Minnesota. Since 1975, the wolf population has remained stable in Minnesota at a level of approximately 1,000 to 1,200 wolves. In addition, there are small populations of wolves on Isle Royale in Michigan (approximately 14) and in the northwest part of Wisconsin (approximately 25).

The wolf was originally classified as endangered under the Act. Due to complaints of livestock depredation on certain farms, the wolf was reclassified as a threatened species in 1978 to allow federal trappers to kill those wolves responsible for these losses. Disputes over the nature and extent of the predation control program resulted in the decision of this court in *Fund for Animals v. Andrus*, Civil No. 5–78–66 (D.Minn.1978). In that case, this court strictly limited the killing of wolves to that case where "reasonable cause exists to believe that said wolf or wolves have committed a significant depredation upon livestock lawfully present in said area." The court went on to limit the area in which federal officials could trap the animals to within ¼ mile of the farm where any livestock were killed. The court further prevented the trapping of wolf pups.

State officials in Minnesota have never been satisfied with federal control of the wolf population. Since this court's order in 1978, the Minnesota Department of Natural Resources (DNR) has made several requests to the United States Fish and Wildlife Service (FWS) to transfer control of the wolf to the State of Minnesota. As a prerequisite to such a transfer, the DNR has demanded that a sport season on the wolf be allowed. The position of the DNR is well-known. As stated in a letter by the DNR Commissioner to an official within the Department of Interior, dated March 26, 1981:

We do not believe that the wolf now or ever has been either endangered or threatened in this state. We believe, as this administration does, that states can

and must manage those resources that fall within their borders. We respectfully request the return of this program to the control of the State of Minnesota.

Our management objectives are as follows:

1) To maintain optimum wolf density and range,

2) To manage the wolf as a furbearer with closely regulated harvest,

3) To provide adequate enforcement and public information, and

4) To provide for population monitoring and research.

Plaintiffs' Exhibit 24. The view of the DNR is more thoroughly explained in the Minnesota Timber Wolf Management Plan of 1980. In this proposed plan, the DNR would allow a "harvest" of 50 wolves within the first year of the plan's implementation. Thereafter, the DNR would adjust the number of wolves taken according to the density of the wolf population.

The Fish and Wildlife Service rejected the DNR's proposal for "management" of the wolf in both 1980 and 1981. The FWS based its rejection largely on its interpretation of the Endangered Species Act, which the FWS construed to prohibit the public hunting of wolves without a finding that population pressures within the wolf's ecosystem cannot otherwise be relieved. Plaintiffs' Exhibits 16 and 17. Since the wolf population has been viewed as stable in recent years, the Service concluded that a public hunting season would not be legally feasible. *Id.* In addition, the Service found that certain other proposals by the DNR regarding the livestock depredation program would violate the order of this court in *Fund for Animals v. Andrus, supra.* Plaintiffs' Exhibits 18 and 19.

In July of 1982, the Service reversed its previous position and published proposed regulations which permitted, in part, a public hunting season on the wolf. 47 Fed. Reg. 38528. The Service issued its final revised wolf regulations on August 10, 1983. These revised regulations are codified in Title 50 of the Code of Federal Regulations and are explained by section below:

1. Section 14.40(d)(2)(i)(B)(4) of the revised regulations allows employees of the Service or the State to take a wolf in response to depredations on lawfully present domestic animals provided that the taking occurs within one-half mile of the place where the depredation occurred. This regulation modifies the original regulation which was based on the order of this court in *Fund for Animals v. Andrus, supra.* Under the previous regulations, the taking of a wolf was allowed only within one-quarter mile of the place where the depredation occurred. Gone from the new regulation is the requirement that any takings be limited to the specific predating wolf or wolves. The requirement that the offending wolf be taken in a humane manner is also deleted.

2. Section 17.40(d)(2)(i)(C) of the revised regulations allows for public trapping of wolves. The Service has divided the State of Minnesota into five wolf "zones," depicted at 50 C.F.R. 17.40(d)(1). In Zone 3, public trapping can take place within areas of recurring depredation up to five miles within the boundaries of the zone. Any trapping in Zone 3 is contingent upon an average population density of not less than one wolf per ten square miles within the zone. In Zone 4, trapping is allowed in areas of recurring depredation provided that an average density of not less than one wolf per 50 square miles is maintained. Trapping in Zone 5 is permitted without density restrictions. No more than 50 wolves may be taken during the first year after the revised regulations have become effective.

3. Section 17.40(d)(2)(i)(D) of the revised regulations allows additional taking by Federal or State employees or agents if the number of wolves prescribed under section 14.40(d)(2)(i)(C) has not been taken during the previous trapping season and if such takings would not reduce the average population densities stated for Zones 3 and 4.

4. Section 17.40(d)(2)(ii)(B) authorizes trade in pelts of wolves taken lawfully in accordance with section 17.40(d)(2)(i)(C).

On August 15, 1983, the government moved to reopen the case of *Fund for Animals v. Andrus, supra,* and asked this court to either clarify or dissolve its order in that case so as to not conflict with the new regulations. On August 16, 1983, plaintiffs filed a motion to serve a supplemental complaint and to petition for relief at the foot of the decree. This court subsequently ordered that the *Fund for Animals* case be reopened. The court then entered pretrial orders regarding discovery and allowed certain plaintiffs to intervene. In addition, a stipulation was submitted by the parties in which it was agreed that the new regulations would not become effective until this court rendered its decision. On November 30, 1983, plaintiffs filed a motion for summary judgment. Thereafter, the government filed a response and also moved for summary judgment.

## II

Both sides agree that this case presents to the court a legal question which is proper for summary judgment. Similarly, both sides rely on their interpretations of the Endangered Species Act in support of their positions. This discussion, therefore, must turn to the Act itself.

Under the Act, Congress has stated that "all Federal departments and agencies shall seek to conserve endangered species and threatened species." 16 U.S.C. § 1531(c)(1). Furthermore, the Secretary of Interior (Secretary) is directed to "issue such regulations as he deems necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). The term "conservation" is defined under the Act as follows:

... the use of all methods and procedures which are necessary to bring any endangered species or threatened species

to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resource management ... and, in the *extraordinary case where population pressures within an ecosystem cannot be otherwise relieved, may include regulated taking.*[2]

16 U.S.C. § 1532(2) (emphasis added).

The plain language of the Act requires that before the taking of a threatened animal can occur, a determination must be made that population pressures within the animal's ecosystem cannot otherwise be relieved. In the present case, the government does not even attempt to argue that such an "extraordinary case" exists. Rather, the novel argument is asserted that the declaration of a sport season is within the Secretary's discretion. In the government's view, the Act creates a substantial difference between the duties of the Secretary in conserving an endangered species and the Secretary's duties with regard to a threatened species.

Cited as authority for this position is 16 U.S.C. § 1533(d), which provides in pertinent part as follows:

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife....

16 U.S.C. § 1538(a)(1) strictly prohibits, among other things, the taking of an endangered fish or animal.[3] Section 1533(d),

---

2. 16 U.S.C. § 1532(14) defines the term "take" as a "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."

3. Section 1538(a)(1) provides, as follows:
   [W]ith respect to any endangered species of fish or wildlife listed pursuant to section 1533

of this title it is unlawful for any person subject to the jurisdiction of the United States to—
(A) import any such species into, or export any such species from the United States;
(B) take any such species within the United States or the territorial sea of the United States;

as quoted above, states that the Secretary *may* prohibit any act with regard to a threatened species that is prohibited under section 1538(a)(1). From this, defendants argue that the Secretary *may* or *may not* prohibit the taking of a threatened animal. As a result, defendants contend that the revised regulations are a proper exercise of the Secretary's discretion.

■ This argument ignores the intent of Congress. The only reasonable construction that this court can place on the statutes in question is that *only* in the case of a threatened species can the Secretary *ever* order that a taking occur. Section 1538(a)(1) strictly forbids the taking of an endangered animal under *any* circumstances. Only with regard to a threatened species may the Secretary exercise his discretion by ordering the taking of an animal. This discretion, however, is limited by that language found in the Act—only in the extraordinary case where population pressures within the ecosystem cannot otherwise be relieved can the Secretary permit the regulated taking of a threatened species.

The legislative history of the Act further compels this court's ruling. The Conference Report submitted with the Act is clear in limiting the circumstances under which the Secretary may permit the taking of a threatened species.

> In view of the varying responsibilities assigned to the administering agencies in the bill, the term [conversation and management] was redefined to include generally the kinds of activities that might be engaged in to improve the status of endangered and threatened species so that they would no longer require special treatment. The concept of conservation covers the full spectrum of such activi-

ties: from total "hands-off" policies involving protection from harassment to a careful and intensive program of control. *In extreme circumstances, as where a given species exceeds the carrying capacity of its particular ecosystem and where this pressure can be relieved in no other feasible way, this "conservation" might include authority for carefully controlled taking of surplus members of the species. To state that this possibility exists, however, in no way is intended to suggest that this extreme situation is likely to occur—it is just to say that the authority exists in the unlikely event that it ever becomes needed.*

Conf.Rep. No. 93–740, 93rd Cong., 1st Sess. 23 (1973), U.S.Code ·Cong. & Admin.News 1973, pp. 2989, 3002 (emphasis added).

Further research into the history of the Act reveals that the issue of what protection should be provided a threatened species was specifically considered during the subcommittee hearings of both the House and Senate. It was the firm intent of both the House and Senate that the purpose of the Act was to restore the population of a threatened species. *See* Endangered Species: Hearings on H.R. 37, H.R. 2169, and H.R. 4758 before the Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House Committee on Merchant Marine and Fisheries, 93rd Cong., 1st Sess. 186 (1973); *and* Endangered Species Conservation Act of 1972; hearings on S. 249, S. 3199 and S. 3818 before the Subcommittee on the Environment of the Senate Committee on Commerce, 92nd Cong., 2nd Sess. 68 (1972). *See also* S.Rep. No. 93–307, 93rd Cong., 1st Sess. 6 (1973), U.S.Code Cong. & Admin. News 1973, p. 2989; H.R. No. 93–412, 93rd Cong., 1st Sess. 20 (1973). In regard to

---

(C) take any such species upon the high seas;
(D) possess, sell, deliver, carry, transport, or ship, by any means whatsoever, any such species taken in violation of subparagraphs (B) and (C);
(E) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

(F) sell or offer for sale in interstate or foreign commerce any such species; or
(G) violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 4 of this Act and promulgated by the Secretary pursuant to authority provided by this Act.

declining numbers of animals classified as threatened, the House Report specifically stated that its intent was to "halt and, if possible, to reverse this decline." *Id.* at 8.

During the 1973 Senate hearings, a proposed amendment was introduced which referred to the terms "conservation" and "management" as including the regulated taking of protected animals. The purpose of this amendment was apparently to minimize the federal preemption of state authority to regulate the taking of resident wildlife. Endangered Species Act of 1973: Hearings on S. 1592 and S. 1983 Before the Subcom. on the Environment of the Senate Comm. on Commerce, 93rd Cong. 1st Sess. 82–83, 91 (1973). Under this amendment, the terms "conservation" and "management" were defined as "for the purpose of increasing and maintaining the number of animals within species and populations of endangered and threatened species at the optimum carrying capacity of their habitat." *Id.* at 91. It was further stated that the terms shall include "the protection, propagation, conservation and restoration of such species, including regulation and regulated taking necessary to these ends." *Id.* at 91. The Senate adopted this amendment and incorporated it into the Senate Bill. S.1983, 93rd Cong., 1st Sess. (1973). No such language was included in the House Bill. H.R. 37, 93rd Cong., 1st Sess. (1973).

When the Senate's definitions of "conservation" and "management" reached the Conference Committee, they were specifically rejected. The term "management" was completely deleted. In addition, the language "increasing and maintaining the number of animals at the optimum carrying capacity of their habitat" was rejected and replaced by the present language in the statute of "bringing any endangered or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." The Conference Committee further replaced "regulation and taking necessary to these ends" with the present language of "in the extraordinary case when population pressures cannot be otherwise relieved, may include reg-

ulated taking." The Committee explained these changes in its Report. As quoted above:

[W]here this pressure can be relieved in no other feasible way, this "conservation" might include authority for carefully controlled taking of surplus members of the species. To state that this possibility exists, however, in no way is intended to suggest that this extreme situation is likely to occur—it is just to say that the authority exists in the unlikely event that it ever becomes needed.

Conf.Rep. No. 93–740, 93rd Cong., 1st Sess. 23 (1973), U.S.Code Cong. & Admin.News 1973, p. 3002.

### III

■ From both a plain reading of the Act and research into its legislative history, this court concludes that the Secretary clearly has an affirmative duty to bring the wolf population to a point where the protections of the Act are no longer needed. To "conserve" the wolf does not mean to "manage" the wolf by declaring a public hunting season. For to do so, would be against the declaration of Congress that the number of wolves be increased. The Eastern Timber Wolf is a threatened species, occupying only 1 percent of its original territory in the contiguous United States. In the case of a threatened species such as the wolf, the Secretary may permit a limited taking, but only in the extraordinary case where population pressures within the wolf's ecosystem cannot otherwise be relieved. This language means that there must be strong evidence that the wolf is exceeding the population limits of its ecosystem before the Secretary can permit any taking of the animal. The Secretary has not so much as whispered that this may be the case. Upon review of the record, the court finds the reason for the Secretary's position to be obvious. The wolf population has indeed been stable since 1975; there is no evidence to indicate that the wolf population has exceeded its limits. It is therefore clear that the Secretary has breached his statutory duty to

conserve the wolf, within the meaning of the Endangered Species Act, by declaring that a sport season on the wolf will be allowed.

The court has listened to the arguments of the defendants that a sport season is needed to enhance the value of the wolf in the eyes of the public. In this respect, the court is aware that some wildlife experts feel that a sport season would reduce the level of wolf-human conflict. It is argued that the public in northern Minnesota sees the wolf as having little value. This is said to contribute to the estimated number of 250 illegal killings that afflict the wolf each year. While these illegal killings must be stopped, this can hardly be accomplished by allowing a sport season and creating a market in wolf pelts. An attempt to "manage" the wolf in this manner is to treat the wolf as a furbearer, and not as a threatened species whose value is determined by its rightful place in nature. While some may place value on the wolf because of its fur or simply as a game animal, the Endangered Species Act has given the wolf a status much more important—it is a protected animal that all persons must seek to conserve. If this is not done, the result is obvious. There will simply no longer be a wolf-human conflict, for there will be no more wolves.

▆ In addition to the regulations allowing a sport season and trade in wolf pelts, the Secretary has sought to expand the current livestock predation control program beyond its present limits. The area in which the wolves may be trapped has gone from one-quarter mile, as previously ordered, to within one-half mile of the farm where the depredation occurred. More than that, there would no longer be a requirement that the trapper determine with reasonable cause the identity of the predating wolf or wolves. In addition, there would not be a requirement that the wolf or wolves be taken in a humane manner. These changes in the law are made without explanation. Certainly this court would encourage any changes in the predation control program that would help the govern-

ment trapper along with taking as few wolves as possible. These new regulations, however, are not justified on that basis. This court has no choice but to conclude that these new regulations only go toward expanding the unnecessary taking of wolves, rather than being designed in accordance to the previous rulings of this court. Accordingly, these regulations concerning the predation control program are also determined to be illegal under the Endangered Species Act.

Plaintiffs have urged that state and federal governments are doing little, if anything, to prevent the illegal killing of wolves. The court finds it very difficult to conclude otherwise when almost one quarter of the wolf population is illegally slaughtered each year. There is no evidence, at least in federal court, that anyone has been prosecuted for these killings. It is apparent that the manpower to enforce the law is there, the quid pro quo being the allowance of a hunting season. But the duty imposed by Congress to increase the wolf population does not hinge upon the existence of a sport season. Every step must be taken to enforce the law as it stands.

The wolf has long been depicted in story and song as a mysterious menace to man's very existence. This concept of the wolf has become engrained in our attitudes and approach toward the wolf. As a result, we have been driven by an ethic which would lead to the wolf's extinction. But Congress has now mandated that each person who would slay the wolf must stay his hand. When Congress took cognizance of the fact that thousands of species of plants and animals had disappeared in past decades, and undertook to curb that desecration, it declared that the wolf had a value as an individual species in danger of extinction. We cannot depend on Canada, or Wisconsin, or Isle Royale, to ensure the prosperity of the wolf. The majority of the burden is ours, and with us it must stay. An increased "war on wolves" in northern Minnesota will not be permitted under the law.

For these reasons, IT IS HEREBY OR-DERED that plaintiffs' motion for summary judgment is granted.