**SIERRA CLUB and Defenders of Wildlife, et al., Appellees,**

v.

**William P. CLARK, as Secretary of the Interior and the Department of the Interior, et al., Appellants.**

**Nos. 84–5042, 84–5134.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 10, 1984.

Decided Feb. 19, 1985.

---

Ross, Circuit Judge, dissented· and filed opinion.

Dianne H. Kelly, Dept. of Justice, Washington, D.C., for appellants.

Philip Olfelt, Asst. Atty. Gen., St. Paul, Minn., for amicus curiae.

Brian B. O'Neill, Amy B. Bromberg, Minneapolis, Minn., for appellees.

Before ROSS, McMILLIAN and JOHN R. GIBSON, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

The chief issue before us is whether the Secretary of the Interior is authorized by the Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1543 (1982), to issue regulations permitting the sport trapping of the Eastern Timber Wolf. Also in question are the legality of certain additional regulations expanding the predation control program of the wolf in northern Minnesota and the propriety of attorneys' fees awarded the Sierra Club. The district court[1] concluded that public hunting of a threatened species such as the Eastern Timber Wolf is prohibited by the Act except in the extraordinary case where population pressures within the animal's ecosystem cannot otherwise be relieved. As the government had made no such showing, a motion for summary judgment that the sport trapping regulations violate the Endangered Species Act was granted. The district court also concluded that the additional regulations expanding the predation control program of the wolf were illegal, as they were made without explanation. It awarded the Sierra Club $55,369.45 under the attorney fee provision of the Endangered Species Act. We affirm the judgment of the district court as to the sport trapping of the wolf, reverse and remand as to the predation control regulations, and affirm the attorneys' fee award.

---

1. The Honorable Miles W. Lord, Chief Judge, United States District Court for the District of Minnesota.

The case was submitted by stipulation, so the facts are not in controversy. There are approximately 1,000 to 1,200 Eastern Timber Wolves, commonly called gray wolves, in northern Minnesota. This population has remained stable since 1976, despite illegal kills estimated at as much as 25% of the population. There is no information that indicates that the wolf population has exceeded its carrying capacity or that population pressures exist that cannot be relieved other than by a sport season.

Minnesota's gray wolf population was originally listed as "endangered" under the Act.[2] However, after the Eastern Timber Wolf Recovery Team, a body of experts created pursuant to the Act and charged with the development of plans for the conservation and survival of the gray wolf, recommended that "depredation control" be used where wolves were killing domestic animals, in 1978 the Fish and Wildlife Service reclassified the gray wolf as "threatened"[3] in Minnesota and allowed trapping of depredating wolves. The implementing regulations were litigated in *Fund for Animals v. Andrus*, 11 Env't.Rep.Cas. (BNA) 2189 (D.Minn.1978). The district court enjoined the Fish and Wildlife Service from trapping wolves unless such action was necessary and was directed to the removal of specific wolves reasonably believed to have committed significant depredation upon livestock. *Id.* at 2200–01. The court later amended its order to restrict trapping to within one-quarter mile of the place where the predation occurred. *Id.* at 2203.

Several times following the litigation in *Fund for Animals*, the Minnesota Department of Natural Resources (DNR) requested that the Fish and Wildlife Service transfer control of the wolf to it and allow a public sport season. These requests were rejected both because of the failure of the requests to conform to the order in *Fund for Animals*, and because of the Service's position that the Endangered Species Act prohibits public sport trapping of threatened species unless there exists an extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved.

In July 1982, however, the Service published proposed regulations granting the DNR's request for public sport trapping of the wolf. Comments were accepted, and public hearings were held in August 1982. On August 10, 1983, regulations were promulgated allowing public trapping of wolves with certain restrictions.[4] The regulations also modify the existing livestock predation control program: wolves may be taken within one-half mile of the farm where predation occurred; taking is not limited to individual predator wolves; there is no express requirement that wolves be taken in a humane manner.[5]

2. An "endangered species" is defined as "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

3. A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future." 16 U.S.C. § 1532(20).

4. The regulations provide:
The Minnesota Department of Natural Resources may permit persons to take a gray wolf in zones 3, 4, and 5, as delineated in paragraph (d)(1) of this section: *Provided* that
(1) Such taking shall be permitted not more than 5 miles inside the boundary of zone 3, in areas of recurring wolf depredation on lawfully present domestic animals; and the extent of such taking shall be adjusted periodically to maintain an average population density of not less than 1 wolf per 10 square miles (the Minnesota Department of Natural Resources shall determine population density on the basis of generally accepted wildlife census techniques);
(2) In zone 4, such taking shall be permitted primarily in areas of recurring depredation, and the extent of such taking shall be adjusted periodically to maintain an average population density in the zone of not less than 1 wolf per 50 square miles (the Minnesota Department of Natural Resources shall determine population density on the basis of generally accepted census techniques); and
(3) During the first year after the effective date of these regulations, not more than 50 gray wolves may be taken by the public in zone 4.
50 C.F.R. § 17.40(d)(2)(i)(C) (1983).

5. The regulations provide:
Designated employees or agents of the Service or the Minnesota Department of Natural Resources may take a gray wolf without a permit in Minnesota, in zones 2, 3, 4, and 5, as

Shortly after the publication of the new regulations, the Sierra Club, along with numerous other organizations, filed this action. The case was submitted by both parties on motions for summary judgment. On January 5, 1984, the district court entered an order in which it concluded that the regulations were illegal. The court stated:

> The plain language of the Act requires that before the taking of a threatened animal can occur, a determination must be made that population pressures within the animal's ecosystem cannot otherwise be relieved. In the present case, the government does not even attempt to argue that such an "extraordinary case" exists. Rather, the novel argument is asserted that the declaration of a sport season is within the Secretary's discretion.

*Sierra Club v. Clark,* 577 F.Supp. 783, 787 (D.Minn.1984).

The court, however, found the notion of such discretion inconsistent with the Secretary's express statutory duties:

> In the case of a threatened species such as the wolf, the Secretary may permit a limited taking, but only in the extraordinary case where population pressures within the wolf's ecosystem cannot otherwise be relieved. This language means that there must be strong evidence that the wolf is exceeding the population limits of its ecosystem before the Secretary can permit any taking of the animal. The Secretary has not so much as whispered that this may be the case. Upon review of the record, the court finds the reason for the Secretary's position to be obvious. The wolf population has indeed been stable since 1975; there is no evidence to indicate that the wolf population has exceeded its limits. It is therefore clear that the Secretary has breached his statutory duty to conserve the wolf,

within the meaning of the Endangered Species Act, by declaring that a sport season on the wolf will be allowed.

*Id.* at 789–90.

The court also concluded that the changes in the livestock predation control program were made without explanation. It determined that they were not designed in accordance with *Fund for Animals* and could only expand the unnecessary taking of wolves. Therefore, these regulations also were determined to be illegal under the Endangered Species Act. Finally, in a related action, the court awarded the Sierra Club $55,369.45 under the attorneys' fee provision of the Endangered Species Act.

**I.**

■ The Secretary argues that in denying him discretion to allow public sport trapping of the wolf the district court has destroyed the distinction made in the Act between endangered and threatened species.[6] The Secretary claims that while Congress imposed in 16 U.S.C. § 1538(a)(1) a set of mandatory prohibitions regarding *endangered* species, including the taking of such species, it sought to protect *threatened* species by providing that "the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species," further clarifying and particularizing the directive by providing that "the Secretary may by regulation prohibit * * * any act prohibited under section 1538(a)(1)." 16 U.S.C. § 1533(d). Thus, argues the Secretary, Congress granted him discretion to determine whether to impose section 1538(a)(1) prohibitions, including the prohibition on taking, for a threatened species.

The extent of the Secretary's discretion, however, is limited by the requirement that the regulations he is to issue must provide

---

delineated in paragraph (d)(1) of this section, in response to depredations by a gray wolf on lawfully present domestic animals: *Provided,* that such taking must occur within one-half mile of the place where such depredation occurred.

50 C.F.R. § 17.40(d)(2)(i)(B)(4) (1983).

**6.** As the disposition of this case turns upon the relationship of several provisions of the Endangered Species Act, Appendix A sets out in sequence the relevant sections.

for the *conservation* of threatened species. The term is defined in 16 U.S.C. § 1532(3):

> The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, *in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.* (Emphasis added.)

In interpreting these provisions, our starting point must be the plain language of the statute. *Kosak v. United States,* — U.S. —, 104 S.Ct. 1519, 1523, 79 L.Ed.2d 860 (1984); *United States v. Weber Aircraft Corp.,* — U.S. —, 104 S.Ct. 1488, 1492, 79 L.Ed.2d 814 (1984). Further, we bear in mind that statutory definitions of words used elsewhere in the same statute furnish such authoritative evidence of legislative intent and meaning that they are usually given controlling effect. *See Walling v. Portland Terminal Co.,* 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947). "Such internal legislative construction is of the highest value and prevails over * * * other extrinsic aids." 1A C. Sands, *Statutes and Statutory Construction* § 27.02, at 310 (4th ed. 1972). Here the plain language of the statute, including its definitional provisions, compels us to agree with the district court "that before the taking of a threatened animal can occur, a determination must be made that population pressures within the animal's ecosystem cannot otherwise be relieved." 577 F.Supp. at 787. Otherwise, such taking would not constitute an act of conservation under the Act and would fall without

the scope of authority granted to the Secretary.

In reaching this conclusion, we are mindful that the Endangered Species Act is a law of limited scope whose provisions must be read together. In carrying out our duty of ascertaining and applying the intent of Congress, we must "interpret language in one section of a statute consistently with language of other sections and with the purposes of the entire statute considered as a whole." *Adams v. Howerton,* 673 F.2d 1036, 1040 (9th Cir.), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982). The provision under examination, section 1533(d), looks in two directions in the Act: first, as we have already observed, toward the definition of "conservation" in section 1532(3); second, by specific reference, toward section 1538(a)(1). If we turn to section 1538, we find that it prohibits, among other acts, the taking of any endangered species. Once again, we must turn to section 1532(19) for a statutory definition of taking. Further, we note that the terms "endangered species" and "threatened species" are also defined in section 1532(6) and (20) respectively.[7] Thus, as we trace out the meaning of the provisions of section 1533(d), it becomes abundantly clear that the interrelationship of the various sections of the Act is crucial to the task of proper discernment. Congress declared as its policy in the Act "that all Federal departments and agencies shall seek to *conserve* endangered species and threatened species." 16 U.S.C. § 1531(c)(1) (emphasis added). This underscores the significance of the term "conservation" which appears so frequently in the Act. To fail to use Congress' definition of this key term would be to refuse to give effect to a crucial part of the enacted statutory law. *See* 1A C. Sands, *supra,* at 310.

The government argues that the district court's holding depends upon the use of a general definitional provision to nullify a specific provision of the Act and, in support of its contention, points to *Clifford F. Mac-*

---

7. In fact, no fewer than nine terms defined in section 1532—"person," "United States," "endangered species," "import," "take," "fish or wild-life," "species," "commercial activity," and "Secretary"—appear in section 1538(a)(1).

*Evoy Co. v. United States ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163 (1944) (specific terms and language prevail over general terms and language). *MacEvoy* dealt with a statute that in one section generally required government contractors to furnish surety bonds, but then in another section limited the right to bring suit on such bonds. The case turned on the meaning of the term "subcontractor"; it is clear from the Court's comments that had Congress defined the term, that definition would have been controlling. *See id.* at 108, 64 S.Ct. at 894. We think it obvious that in the case before us there is no nullification involved in utilizing Congress's definition of "conservation." Rather, in applying the statutory definition of "conservation" to all portions of the Act in which it appears we have amplification and clarification of the meaning of the Act.

The argument that the district court has eliminated the distinction between the two categories of threatened and endangered species is without merit. The district court made clear that two levels of protection would remain under its interpretation of the statute:

> Section 1538(a)(1) strictly forbids the taking of an endangered animal under *any* circumstances. Only with regard to a threatened species may the Secretary exercise his discretion by ordering the taking of an animal. This discretion, however, is limited by that language found in the Act—only in the extraordinary case where population pressures within the ecosystem cannot otherwise be relieved can the Secretary permit the regulated taking of a threatened species.[8]

577 F.Supp. at 788 (emphasis in original).

The Secretary argues that this interpretation is incorrect and instead that the proper scheme is one in which "endangered species can be taken under strictly controlled circumstances only when their numbers exceed the carrying capacity of their ecosystems" while "threatened species can be taken pursuant to regulatory measures which address the problems contributing to the species' decline." He bases this scheme solely on the definition of "conservation" in section 1532(3). In that definition the methods and procedures of conservation, including regulated taking where population pressures within an ecosystem cannot otherwise be relieved, are stated to be applicable to *both* endangered species and threatened species. The Secretary, retreating from the thrust of his earlier argument, argues that the section 1532(3) definition allows the taking of endangered species and should prevail over the prohibitions of section 1538(a)(1). Thus, while both the district court and the Secretary find two levels of protection in the Act, the Secretary argues that the 1532(3) definition affords him a discretionary base that the district court has ignored.

■ Once again, however, the Secretary has ignored the interrelations of the Act. Section 1533(d), when read in conjunction with the definition of "conservation" in section 1532, limits the Secretary's discretion as to threatened species. Section 1538(a)(1), when read in conjunction with the definition of "taking" in section 1532, further limits the Secretary's discretion as to endangered species. The definition of "conservation" in section 1532 does not nullify the provision of section 1538 that prohibits taking an endangered species, for the term "conservation" does not appear in section 1538. The Secretary simply ignores the language of the Act and the statutory

---

8. The levels of protection afforded threatened and endangered species are, of course, subject to the provisions of 16 U.S.C. § 1539(a)(1)(A):

> The Secretary may permit, under such terms and conditions as he shall prescribe—* * * any act otherwise prohibited by section 1538 of this title for scientific purposes or to enhance the propagation or survival of the affected species.

While this exception does not authorize establishment of a public sport season, it does give the Secretary discretion to permit, for example, the removal of depredating animals or the culling of diseased animals from a population, thus allaying the dissent's concern that the Secretary would be unduly restricted if faced by such problems.

definitions that Congress adopted to give it force. When we read sections 1533 and 1538 in light of their statutorily defined terms and in conjunction with each other, we find they clearly support the district court's interpretation of the two levels of protection provided.

The Secretary apparently seeks to justify his interpretation of the statute by asserting that "the labyrinthian contortions of its language have generated confusion and controversy for years." He overstates his case. We note that Chief Justice Burger in his consideration of section 1536 of the Act in *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 173, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978), found that the "ordinary meaning of plain language" in the statute was controlling. Similarly, we believe the language of the statutory provisions at issue here is clear. We conclude that the statute on its face limits the discretion of the Secretary to allow public sport hunting of threatened species.

## II.

The Secretary argues at length that legislative history reveals a congressional intent to give the Secretary discretion to allow taking of threatened species. We must interpret the statute in light of the purposes Congress sought to serve, *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979), and legislative history may play an important part in discerning these purposes.[9] However, contrary to the Secretary's position, we find that the legislative history supports our interpretation of the Act.

As the district court pointed out, the conference report submitted with the Act clearly indicates an intent to limit the Secretary's discretion to permit taking of threatened species:

In view of the varying responsibilities assigned to the administering agencies in the bill, the term [conservation] was redefined to include generally the kinds of activities that might be engaged in to improve the status of endangered and threatened species so that they would no longer require special treatment. The concept of conservation covers the full spectrum of such activities: from total "hands-off" policies involving protection from harassment to a careful and intensive program of control. *In extreme circumstances, as where a given species exceeds the carrying capacity of its particular ecosystem and where this pressure can be relieved in no other feasible way, this "conservation" might include authority for carefully controlled taking of surplus members of the species. To state that this possibility exists, however, in no way is intended to suggest that this extreme situation is likely to occur—it is just to say that the authority exists in the unlikely event that it ever becomes needed.*

Conf.Rep. No. 740, 93rd Cong., 1st Sess. 23, *reprinted in* 1973 *U.S.Code Cong. & Ad.News* 2989, 3001, 3002 (emphasis added). Because a "conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent." *Demby v. Schweiker,* 671 F.2d 507, 510 (D.C.Cir.1981). The un-

---

**9.** Normally, legislative history is relied on only when the language of the statute is ambiguous. In *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), Chief Justice Burger commented on the relevance of the legislative history of the Endangered Species Act to the construction of the statute:

When confronted with a statute which is plain and unambiguous on its face, we ordinarily do not look to legislative history as a guide to its meaning. * * * Here it is not *necessary* to look beyond the words of the statute. We have undertaken such an analy-

sis only to meet * * * [the dissent's] suggestion that the "absurd" result reached in this case * * * is not in accord with congressional intent.

437 U.S. at 184 n. 29, 98 S.Ct. 2296–97 n. 29 (emphasis in original).

Similarly, in the instant case, given our conclusions regarding the language of the statute we have reached above, we are not compelled to examine the legislative history of the Act. Nonetheless, we do so in order to insure that we have not thwarted or distorted congressional intent.

ambiguous language of this conference report must be given great weight.

The Secretary, however, argues that this report is unpersuasive evidence of intent and, indeed, misleading, since it reflects "an unarticulated and in fact nonexistent House view that regulated taking would occur only where extraordinary population pressures existed." Rather, argues the Secretary, the House in its report had explicitly endorsed secretarial discretion as to taking of threatened species.

The Secretary's view depends largely on the statement in the House report that:

> The Secretary is authorized to issue appropriate regulations to protect endangered or threatened species: he may also make specifically applicable any of the prohibitions with regard to threatened species that have been listed in section 9(a) as are prohibited with regard to endangered species. *Once an animal is on the threatened list, the Secretary has an almost infinite number of options available to him with regard to the permitted activities for those species. He may, for example, permit taking, but not importation of such species, or he may choose to forbid both taking and importation but allow the transportation of such species.*

H.R.Rep. No. 412, 93rd Cong., 1st Sess. 12 (1973) (emphasis added).

It is clear from the remainder of the report, however, that such options were to be exercised only in the promulgation of regulations that "would serve to conserve, protect, or restore the species concerned in accordance with the purposes of the Act" which were, inter alia, "to provide a means for protecting the ecosystems upon which we and other species depend" and "to provide a specific program for the protection of endangered [and threatened] species." H.R.Rep. No. 412, *supra*, at 10, 11. The "almost infinite options," then, had to serve the purpose of protection and conservation of the threatened species.

In contrast, the Senate bill that went into the Conference Committee did grant the Secretary discretion to authorize a sport season for threatened species:

> 4(e) PROTECTIVE REGULATIONS.— Whenever the Secretary lists a species of fish or wildlife as a threatened species, pursuant to subsection (a) of this section, he shall issue such regulations as he deems necessary and advisable to provide for the *conservation and management* of such species. With respect to any threatened species, the Secretary may by regulation prohibit any act prohibited with respect to an endangered species under section 10(a) of this Act.

\*   \*   \*   \*   \*   \*

> 3(1) "Conservation" and "management" mean the collection and application of biological information for the purposes of increasing and maintaining the number of animals within species and populations of *endangered* and *threatened* species at the *optimum carrying capacity* of their habitat. Such terms include the entire scope of activities that constitute a modern scientific resources program, including, but not limited to, research, census, law enforcement, and habitat acquisition and improvement. Also included within these terms when and where appropriate, is the protection, propagation, conservation and restoration of such species, *including regulation and taking necessary to these ends.*

S.1983, 93rd Cong., 1st Sess. §§ 4(e) & 3(1) (1973) (emphasis added).

As the Sierra Club points out, the terms "management" and "optimum carrying capacity" are terms of art in the field of wildlife management. These terms are used to describe approaches to "manipulation [of species] . . . to produce 'harvestable surpluses' . . . for the benefit of hunters and fisherman who pay for the management programs." Coggins & Ward, *The Law of Wildlife Management on the Federal Public Lands,* 60 Or.L.Rev. 59, 66 (1981). Therefore, the Senate bill envisioned management of threatened species in order to allow public sport taking of the animals.

Thus, the Senate and House bills were in conflict when they reached the Conference Committee. The Conference Committee eliminated the terms "management" and "optimum carrying capacity." "Conservation" was redefined "to include the full spectrum of" activities "that might be engaged in to improve the status of endangered and threatened species so that they would no longer require special treatment." Conf.Rep. No. 740, *supra*, at 23, U.S.Code Cong. & Admin.News 1973, p. 3002. It was in conjunction with these changes in the bill that the Committee stated that controlled taking should be limited to "extreme circumstances, as where a given species exceeds the carrying capacity of its particular ecosystem and where this pressure can be relieved in no other feasible way." *Id.* We cannot agree with the Secretary that these changes and comments merely reflect an "unarticulated" or "nonexistent House view." Rather, they appear to have been a deliberate response to the concept of "management" in the Senate bill and an intentional limitation of the Secretary's discretion to allow the regulated taking of threatened species.

■ The Secretary makes much of the opinions expressed by various officials of interested federal agencies at hearings on the bill. These opinions need not detain us, given the evolution of congressional intent we have traced out above. Testimony given at congressional hearings should not be accorded undue weight as an indication of legislative intent since the views expressed by witnesses at congressional hearings are not necessarily the same as those of the legislators ultimately voting on the bill. *Austasia Intermodal Lines, Ltd. v. Federal Maritime Commission*, 580 F.2d 642, 645 (D.C.Cir.1978).

Finally, the Secretary argues that subsequent legislative history confirms an intent to grant him broad discretion. We first generally observe, as the Supreme Court has pointed out, that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Product Safety Commission v. GTE Sylvania*, 447 U.S. 102, 117–18, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980), (quoting *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960)). As the Court also stated in *Consumer Product Safety Commission:*

> Petitioners invoke the maxim that states: "Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." * * * With respect to subsequent *legislation,* however, Congress has proceeded formally through the legislative process. A mere statement in a conference report of such legislation as to what the Committee believes an earlier statute meant is obviously less weighty.

447 U.S. at 118 n. 13, 100 S.Ct. at 2061 n. 13 (citations omitted) (emphasis in original); *see also Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 758, 99 S.Ct. 2066, 2072, 60 L.Ed.2d 609 (1979) (whatever evidence concerning Congress' intent in enacting a certain provision might be provided by a committee report written eleven years later was plainly insufficient to overcome clear and convincing evidence concerning congressional intent at the time of the enactment).

The legislative history relied on by the Secretary involves the 1982 amendments to the Act, in which Congress included a new section, 10(j), dealing with experimental populations of endangered or threatened species purposely introduced into areas outside their current range to further their conservation. The Senate Committee Report regarding the amendment states that the Secretary may regulate conservation of such populations, including, where appropriate, direct taking.[10] The Secretary ar-

10. The report states:
   All experimental populations, once determined to be such, are to be treated as though they have been separately listed as threatened species. This provision obliges the Secretary to issue such regulations as he deems necessary and advisable to provide for the conservation of the experimental population, just as he now does under subsection 4(d) for any other threatened species.

gues that the language of the report "flatly contradicts" the district court's interpretation of permissible taking. We think it significant, however, that the report was concerned with regulation of *experimental* populations. It may well be that the discretion given the Secretary in section 1539 would extend to the taking of animals in experimental populations in the case described in the report. It does not follow that the report authorizes or approves of sport taking of threatened species. We must conclude that the legislative history of the Act supports the conclusions we reached above regarding the statutory language.

We view the issue before us as one primarily of interpretation of the statute. Much of the factual background concerning the wolf, a major part of the discussion in the briefs and of the oral arguments of the amicus parties, and much of the colorful language in the district court's opinion, although of substantial interest, simply do not reach the issue that we are required to decide.

### III.

The district court also considered the changes the regulations made in the livestock predation control program:

> In addition to the regulations allowing a sport season, * * * the Secretary has sought to expand the current livestock predation control program beyond its present limits. The area in which the wolves may be trapped has gone from one-quarter mile, as previously ordered, to within one-half mile of the farm where the depredation occurred. More than that, there would no longer be a requirement that the trapper determine with reasonable cause the identity of the predating wolf or wolves. In addition, there would not be a requirement that the wolf or wolves be taken in a humane manner. These changes in the law are made without explanation. Certainly this court would encourage any changes in the predation control program that would help the government trapper along with taking as few wolves as possible. These new regulations, however, are not justified on that basis. This court has no choice but to conclude that these new regulations only go toward expanding the unnecessary taking of wolves, rather than being designed in accordance to the previous rulings of this court. Accordingly, these regulations concerning the predation control program are also determined to be illegal under the Endangered Species Act.

577 F.Supp. at 790.

In its promulgation of the regulations, the Fish and Wildlife Service stated that the distance limitation had been expanded to one-half mile because "topography occasionally eliminates the possibility of effective trapping." Regulations Governing the Gray Wolf in Minnesota, 48 Fed.Reg. 36,256, 36,258 (1983). It further stated it would allow the killing of any wolf caught within the one-half mile distance since farmer outrage over the release of a trapped wolf "cannot serve the cause of wolf conservation" and since "[a]lthough immature animals may themselves be unable to kill livestock, their existence and their need for food probably are major reasons for the occurrence of depredation, and they probably are learning to commit depredations." *Id.* Finally, while the regulations authorize the use of steel traps, the Service stated that "the steel trap when

---

The purpose of requiring the Secretary to proceed by regulation is to provide a vehicle for the development of special regulations for each experimental population that will address the particular needs for that population. The Secretary is granted broad flexibility in promulgating regulations to protect threatened species. These regulations may even allow the taking of threatened animals. * * Where appropriate, the regulations may allow for the direct taking of experimental populations. For example, regulations pertaining to the release of experimental populations of predators, such as red wolves, will probably allow for the taking of these animals if depredations occur or if the release of these populations will continue to be frustrated by public opposition.

S.Rep. No. 418, 97th Cong., 2d Sess. 8 (1982).

properly used is an effective and humane method of taking wolves." *Id.* at 36,263.

The Secretary argues on appeal that these statements were explanations, that finding an explanation inadequate is not identical to finding it nonexistent, and that "for all practical purposes, no analysis was conducted by the district court of whether the Service decision was reasonably based and reached after consideration of all relevant factors." The Sierra Club argues in reply that brief conclusory assertions do not rise to the level of explanations, that the expression of a need to take wolf pups did not explain the general taking of wolves permitted near farms where predation occurs, and that the elimination of the "humane manner" requirement was not specifically explained.

■■■ The parties agree that an agency must provide explanations when its rulemaking reflects significant changes in policy. As the regulations were promulgated under the informal rulemaking procedures of section 553 of the Administrative Procedures Act, the standard of review is whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). The rescission or modification of rules is subject to this standard, and "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

■■■ We can find no indication in the district court's opinion that this standard was applied. There is a vast difference between a failure to explain and a failure to explain adequately. The argument that brief assertions do not rise to level of explanations is, essentially, an argument of *adequacy*, requiring an explicit test of such assertions. Similarly, once statements purporting to explain particular rules are made, the question becomes the *extent* to

which they actually do so. The presence of the statements means that the necessary condition of their existence has been met. The next task of the reviewing court is to address the sufficiency of these statements under the "arbitrary and capricious" standard. Accordingly, we reverse the district court's conclusions as to the regulations involving predation control and remand for further consideration in light of our discussion above.

## IV.

The remaining issue is the propriety of the fees awarded Sierra Club's counsel by the district court. The district court made the following findings as to lodestar figures and other costs:

| | Hourly Rate | Hours | Total |
|---|---|---|---|
| Attorneys: | | | |
| Brian O'Neill | $115 | 221 | $25,415.00 |
| Amy Bromberg | 60 | 124 | 7,440.00 |
| Other costs: | | | |
| Legal Assistants | | | 213.75 |
| Disbursements and Expenses | | | 5,244.20 |
| Student Interns | 10 | 720 | 7,200.00 |
| | | | $45,512.95 |

A 30% upward adjustment was then applied to the lodestar figures for the two attorneys, making the total fees and expenses awarded $55,369.45.

■■■ The Endangered Species Act provides that in suits brought by private parties to enforce the terms of the Act, the court may award the costs of litigation (including reasonable attorney and expert witness fees) to any party when the court determines such an award is appropriate. 16 U.S.C. § 1540(g)(4). In *Ruckelshaus v. Sierra Club*, 462 U.S. 680, 103 S.Ct. 3274, 3281, 77 L.Ed.2d 938 (1983), the Supreme Court interpreted an identical provision in the Clean Air Act as allowing fees only when the petitioner achieves "some success on the merits" of its claims. Here the Sierra Club clearly has achieved such success. While we are reversing and remanding for further consideration of the predation control regulations, both parties treat-

ed this question as a relatively minor issue (for example, in his main brief the Secretary devoted but two of the eighteen pages of his argument to the issue). The Sierra Club has otherwise prevailed and is eligible for the award.

The Secretary argues, however, that the upward adjustment is not justified. The district court found that the multiplier of 30% was appropriate "due to both the contingent nature of the success attained by plaintiffs, and the public importance of that success." *Sierra Club v. Clark,* No. 5–83–254, slip op. at 7 (D.Minn. June 25, 1984). It further found that the issue was a "novel one" and a "difficult one which could not have been easily predicted." *Id.* at 8. The court found these extraordinary circumstances and the importance of the case to the management of all threatened species justified the enhancement.

The Secretary argues in response that *Blum v. Stenson,* —— U.S. ——, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984), held that "[n]either complexity nor novelty of the issues * * * is an appropriate factor in determining whether to increase the basic fee award," since such factors will be reflected in the numbers of hours devoted to the matter and the determination of a reasonable hourly rate. While the point is well taken, *Blum* also cites with approval the recognition in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983), that "in some cases of exceptional success an enhanced award may be justified." [11] While the issue is close, after carefully considering the case as a whole and the various factors enunciated by the district court, we cannot conclude that the court abused its discretion in enhancing the award or that such enhancement is contrary to the principles of *Blum.*

We affirm the judgment of the district court as to the illegality of the regulations permitting sport trapping of the gray wolf, reverse and remand for further consideration of the expanded predation control regulations, and affirm the award of attorneys' fees.

ROSS, Circuit Judge, dissenting.

I respectfully dissent. The Secretary's authority to utilize regulated taking of threatened species as a method of conservation is *not limited* to the "extraordinary case where population pressures cannot be otherwise relieved." 16 U.S.C. § 1532(3) (1982). Instead, the Secretary's authority in this respect is limited only by the necessity that, if regulated taking is to be utilized, it must further the effort to bring threatened species "to the point at which the measures provided pursuant to * * * [the Endangered Species Act] * * * are no longer necessary." *Id.*

As applied to this case, the Secretary's authority to utilize regulated taking of timber wolves is limited only by the requirement that such method aid the effort of bringing the wolves to the point at which they can survive and propagate without the need of the protections of the Endangered Species Act. The fact that timber wolves do not exceed the population limits of its ecosystem is not determinative. Since the district court failed to make a finding that the sport trapping regulation at issue either furthered, or did not further, the effort to conserve the timber wolf, I would remand the case for a finding on this issue.

My construction of the Endangered Species Act is compelled by the plain language and legislative history of the Act, as well as the proper fulfillment of the purposes Congress sought to achieve when it promulgated the Act.

The Secretary's authority to regulate threatened species is provided for in 16 U.S.C. § 1533(d) (1982), which provides that the "Secretary shall issue such regulations as he deems necessary and advisable to provide for the *conservation* of such species." *Id.* (Emphasis added). The term

---

**11.** The Court also noted that "[i]n these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." 103 S.Ct. at 1940.

"conservation" is specifically defined as follows:

> (3) The terms "conserve", "conserving", and *"conservation" mean to use and the use of all methods* and procedures *which are necessary to bring any* endangered species or *threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods* and procedures *include, but are not limited to,* all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

16 U.S.C. § 1532(3) (1982) (emphasis added).

The plain language of the statute refuses to limit the methods available to the Secretary. Yet, the majority opinion concludes that "section 1532 * * * *limits* the Secretary's discretion as to threatened species" to the case where such species exceeds the population limits of its ecosystem. *Ante* at 614 (emphasis added). This approach entirely ignores the "but are not limited to" language of section 1532(3).

Even the legislative history relied upon by the majority opinion supports a conclusion that Congress did not intend to adopt the approach taken by the trial court. The legislative history cited by the majority states that: "In extreme circumstances, *as where* a given species exceeds the carrying capacity of its particular ecosystem and where this pressure can be relieved in no other feasible way, this 'conservation' might include authority for carefully controlled taking of surplus members of the species." *Ante* at 615 (emphasis added). *See also ante* at 617. The "as where" language clearly indicates that Congress intended that the existence of population pressures was only *one example* of when regulated taking might serve a conservation purpose.

Finally, the purposes Congress sought to achieve when it promulgated the Endangered Species Act are not furthered by limiting the Secretary's authority to utilize regulated taking of threatened species solely to the "case where population pressures cannot be otherwise relieved." The clear purpose of the Endangered Species Act was to further conservation efforts. Congress did not intend to foreclose the use of methods which might achieve this purpose.

My conclusion in this case is buttressed by the following example: Several members of a pack of wolves became afflicted with a disease which is highly contagious between members of the species and which leaves visible signs of its presence. The Secretary seeks to utilize a regulated taking of the diseased animals to prevent the spread of the disease. However, a regulated taking of diseased animals which might infect an entire threatened species is not expressly set forth as a method of conservation in section 1532(3). Nor would such a circumstance constitute a "case where population pressures cannot be otherwise relieved." Yet, an appropriately defined regulated taking would clearly constitute a useful method of conservation in such a case. The majority's approach, however, would foreclose the use of regulated taking in such a case.

The majority notes that my concerns with the imposition of undue restrictions on available conservation methods are allayed by the provisions of 16 U.S.C. § 1539(a)(1)(A). *Ante* at 614, n. 8. This provision grants the Secretary the authority to permit *"any act * * * to enhance the propagation or survival of the affected species."* If this provision were properly applied by the majority, my concerns in this case would indeed be allayed, since § 1539(a)(1)(A) would permit the use of a public sport season as a conservation method if such method would enhance the propagation or survival of the timber wolf. Again, however, the majority reads a limitation on the use of conservation methods into a provision where no limitation is either written or intended.

In sum, I would remand the case for a determination as to whether the Secretary's regulations further a conservation purpose. If it were established that this purpose could be furthered by letting the public kill wolves for sport and sell the pelts, then this method would not be foreclosed by the Endangered Species Act. In fact, the Endangered Species Act might actually require that this method be used. The majority's approach is overbroad and thus detrimental to possible future beneficial uses of regulated taking as a method of conservation. Accordingly, I must dissent.

I would also reduce substantially or eliminate the attorneys fees awarded by the district court. Even if the trial court was completely affirmed the 30 percent additur was clearly wrong.

## APPENDIX A

16 U.S.C. § 1531(c)(1):

It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.

16 U.S.C. § 1532(3):

The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

16 U.S.C. § 1532(6):

The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man.

16 U.S.C. § 1532(19):

The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

16 U.S.C. § 1532(20):

The term "threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

16 U.S.C. § 1533(d):

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

16 U.S.C. § 1538(a)(1)(B):

Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to—

take any such species within the United States or the territorial sea of the United States.

16 U.S.C. § 1539(a)(1)(A):

The Secretary may permit, under such terms and conditions as he shall prescribe—

any act otherwise prohibited by section 1538 of this title for scientific purposes or to enhance the propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j) of this section.