## In re POLAR BEAR ENDANGERED SPECIES ACT LISTING AND § 4(D) RULE LITIGATION

This Document Relates To: Ctr. for Biological Diversity, et al. v. Salazar,[1] et al., No. 08–2113; Defenders of Wildlife v. U.S. Dep't of the Interior, et al., No. 09–153.

Misc. No. 08–764 (EGS).
MDL Docket No. 1993.

United States District Court,
District of Columbia.

1. Pursuant to Fed.R.Civ.P. 25(d), Interior Secretary Ken Salazar is automatically substi-

Oct. 17, 2011.

tuted as a defendant for his predecessor, Dirk Kempthorne, who was sued in his official capacity.

Anna Margo Seidman, Safari Club International, John C. Martin, Crowell & Moring LLP, Benjamin Ellison, Patton Boggs, LLP, Michael B. Wigmore, Bingham McCutchen LLP, Benjamin Longstreth, Natural Resources Defense Council, Jason C. Rylander, Defenders of Wildlife, Howard M. Crystal, Meyer Glitzenstein & Crystal, Washington, DC, Bradley E. Meyen, Assistant Attorney General, Department of Law, Anchorage, AK, Craig D. Galli, Holland & Hart LLP, Salt Lake City, UT, M. Reed Hopper, Theodore Hadzi–Antich, Damien M. Schiff, Pacific Legal Foundation, Sacramento, CA, Murray D. Feldman, Holland & Hart LLP, Boise, ID, Brendan R. Cummings, Kassia R. Siegel, Joshua Tree, CA, Andrew Elsas Wetzler, Rebecca Riley, Natural Resources Defense Council, Inc., Chicago, IL, John J. Jack-

son, III, Conservation Force, Metairie, LA, for Plaintiffs.

Douglas Scott Burdin, Safari Club International, Thomas Richard Lundquist, Crowell & Moring LLP, Washington, DC, for Plaintiffs/Defendant.

Guillermo A. Montero, Kristen Byrnes Floom, Clifford Eugene Stevens, Jr., Meredith L. Flax, Robert Pendleton Williams, Hao–Chin Hubert Yang, Erik Edward Petersen, U.S. Department of Justice, John F. Cooney, Margaret N. Strand, Venable, LLP, Rachel D. Gray, Roger R. Martella, Jr., Thomas G. Echikson, Sidley Austin LLP, Washington, DC, Jeffrey M. Feldman, Kevin M. Cuddy, Feldman Orlansky & Sanders, Anchorage, AK, for Defendants.

Jeffrey W. Leppo, Ryan P. Steen, Stoel Rives LLP, Seattle, WA, Joseph Michael Klise, Crowell & Moring LLP, Washington, DC, for Intervenor Defendant.

### MEMORANDUM OPINION

EMMET G. SULLIVAN, District Judge.

On May 15, 2008, the U.S. Fish and Wildlife Service ("the Service" or "the agency") published its final rule listing the polar bear as a threatened species under the Endangered Species Act ("ESA"). *See* Determination of Threatened Status for the Polar Bear (*Ursus maritimus*) Throughout Its Range, 73 Fed. Reg. 28,-212 (May 15, 2008) ("Listing Rule"). This Court recently upheld the Listing Rule as a reasonable exercise of agency discretion. *See generally In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litigation,* 794 F.Supp.2d 65 (D.D.C.2011)[hereinafter *In re Polar Bear*]. The two cases currently before the Court arise from a related agency rule, Special Rule for the Polar Bear, 73 Fed. Reg. 76,249 (December 16, 2008) ("Special Rule"), which specifies the protective mechanisms that apply to the polar bear as a result of its threatened status.

Section 4(d) of the ESA requires the Service to promulgate such rules as it deems "necessary and advisable to provide for the conservation of [threatened] species." 16 U.S.C. § 1533(d). Although the polar bear is already regulated in the United States under the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361–1423h, as well as treaties and other international agreements, the Service determined that it is nonetheless necessary and advisable for the conservation of the species to extend additional ESA protections to the polar bear, pursuant to Section 4(d). Among other things, the Service's Special Rule aims to address the threat of direct impacts to individual bears and their habitat from oil and gas exploration and development activities within the species' current range.

The plaintiffs in this case have challenged the agency's Special Rule for the polar bear under the ESA, 16 U.S.C. §§ 1531–1544; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706. Pending before the Court are the parties' cross-motions for summary judgment. Plaintiffs claim, first, that the Service's Special Rule violates the ESA because it fails to provide for the conservation of the polar bear. Specifically, plaintiffs contend that the Service cannot effectively provide for the conservation of the polar bear without addressing global greenhouse gas emissions, which the agency itself identified as the cause of increasing Arctic temperatures that are expected to lead to a significant decline of the polar bear's sea ice habitat. Plaintiffs argue that the Service purposely and unlawfully crafted its Special Rule in such a way as to avoid addressing this threat, in contravention of the ESA's conservation mandate.

The Court understands plaintiffs' frustration. However, as this Court has previously observed, climate change poses unprecedented challenges of science and policy on a global scale, and this Court must be at its most deferential where the agency is operating at the frontiers of science. *See In re Polar Bear*, 794 F.Supp.2d at 69. Here, the Service concluded based on the evidence before it that Section 4(d) of the ESA is not a useful or appropriate tool to alleviate the particular threat to the polar bear from climate change caused by global greenhouse gas emissions, and plaintiffs have offered no compelling evidence to the contrary. Although the Court is sensitive to plaintiffs' arguments for a strong mechanism to combat the effects of global climate change, the Court finds that the agency's conclusion was not arbitrary, capricious, or contrary to law. The Court is therefore prohibited from substituting either the plaintiffs' or its own judgment for that of the agency. The question before the Court, then, is whether the Service reasonably concluded that its Special Rule provides for the conservation of the polar bear even if it does not reverse the trend of Arctic sea ice loss. As will be discussed below, the Court is persuaded that the agency has done so. Accordingly, with respect to plaintiffs' ESA claim, the Court **DENIES** plaintiffs' motion for summary judgment and **GRANTS** the federal defendants' and defendant-intervenors' motions for summary judgment.

In addition to their claims under the ESA, plaintiffs claim that the Service violated NEPA by failing to analyze the potential environmental impacts of its Special Rule, which is generally required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). With respect to this claim, the Court agrees with plaintiffs.

The Court declines to recognize the broad NEPA exemption that the federal defendants urge.

Accordingly, and for the reasons discussed below, the Court finds that the Service was required to conduct at least an initial assessment to determine whether its Special Rule for the polar bear warranted a full "environmental impact statement" ("EIS"). Here, the Service conducted no analysis whatsoever; as a result, its Special Rule for the polar bear violates NEPA. Accordingly, with respect to plaintiffs' NEPA claim, the Court **GRANTS** plaintiffs' motion for summary judgment and **DENIES** the federal defendants' and defendant-intervenors' motions for summary judgment. The Court finds that vacatur of the final Special Rule is the appropriate remedy for the Service's NEPA violation. Upon vacatur of the final Special Rule, the prior May 15, 2008, interim final Special Rule for the polar bear shall remain in effect until further Order of the Court.

## I. BACKGROUND

### A. Statutory and Regulatory Background

#### 1. ESA

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA further defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species back to the point at which the measures provided are no longer necessary." *Id.* § 1532(3). An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A "threatened species" is "any

species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."[2] *Id.* § 1532(20).

Under the conservation program established by the ESA, a designation of "endangered" triggers a broad range of legal protections. Most relevant to this case is the general prohibition on "taking" any endangered species, which is set forth in Section 9 of the ESA.[3] *See id.* § 1538(a)(1). The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). By regulation, the Service has further defined "harm" to mean "an act which actually kills or injures wildlife." 50 C.F.R. § 17.3. Such acts may include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." *Id.*

Section 10 of the ESA creates exceptions to the general rule against taking endangered species. Specifically, the Secretary may issue permits authorizing the taking of endangered species if such taking is "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

The ESA does not prohibit the taking of threatened species. However, Section 4(d) of the ESA provides:

> [W]henever any species is listed as a threatened species . . . the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 9(a)(1), in the case of fish or wildlife. . . .

*Id.* § 1533(d). Section 4(d) of the ESA thus authorizes the Service to extend any or all of the Section 9 take prohibitions, as well as other necessary protective measures, to any threatened species.

Pursuant to this section, the Secretary of the Interior has issued a general regulation that extends all of the Section 9 take prohibitions to *all* threatened species. *See* 50 C.F.R. § 17.31(a). However, this regulation provides that where the agency issues a special rule for a particular species pursuant to Section 4(d), that special rule "will contain all the applicable prohibitions and exceptions" and "none of the provisions of [paragraph (a)] . . . will apply." *Id.* § 17.31(c). Accordingly, a special rule for a particular threatened species supersedes the general rule that applies to all threatened species.

## 2. MMPA

The MMPA has governed the management of polar bear populations in the United States since 1972. Congress enacted the MMPA to preserve and replenish marine mammal populations.[4] *See* 16 U.S.C.

---

**2.** The ESA requires the Secretary of the Interior to publish and maintain a list of all species that are designated as threatened or endangered. *Id.* § 1533(c). The Secretary of the Interior and the Secretary of Commerce are responsible for making listing decisions. *Id.* §§ 1532(15), 1533(a)(2). The Secretary of the Interior has delegated his responsibilities under the ESA to the Service. *See* 50 C.F.R. § 402.01(b).

**3.** In addition, Section 7 of the ESA provides that all federal agencies must take steps to

ensure that any actions they authorize, fund, or carry out are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). The Special Rule does not purport to affect any obligations under Section 7 with respect to the polar bear.

**4.** The Secretary of the Interior has jurisdiction over most marine mammals covered by the MMPA, including the polar bear. 16

§ 1361(2). The MMPA imposes a general moratorium on the taking and import of marine mammals and marine mammal products. *See id.* § 1371(a). Under the MMPA, the term "take" is defined as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13).

Like the ESA, the MMPA provides some limited exceptions to its moratorium on taking marine mammals. The Secretary may issue permits authorizing the incidental, but not intentional, taking of a marine mammal while engaging in an otherwise lawful activity, *see id.* § 1371(a)(5)(A)(i), provided such take "will have a negligible impact" on the species, *id.* § 1371(a)(5), (D)(i)(I).

### 3. NEPA

■ Congress enacted NEPA for two purposes: (1) to inform agency decision-makers of the significant environmental effects of proposed major federal actions and (2) to inform the public so that they "may also play a role in both the decision-making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). To achieve these goals, NEPA requires every federal agency to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "Major federal actions" are defined by regulation as "new or revised agency rules, regulations, plans, policies or procedures." 40 C.F.R. § 1508.18(a).

An EIS must contain a detailed statement of:

(1) the environmental impact of the proposed action;

(2) any adverse environmental effects that cannot be avoided should the proposed action be implemented;

(3) alternatives to the proposed action;

(4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and

(5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). Among other things, the agency must compare the environmental effects of its proposed action and other reasonable alternatives against a baseline of "no action." 40 C.F.R. § 1502.14(d). In addition, every EIS must be made available for public review and comments, and the agency is required to consider and respond to all comments it receives. *Id.* § 1503.1, .4.

NEPA's implementing regulations establish guidelines for determining whether and when to prepare an EIS. First, the agency must determine whether the proposed action is the type for which an EIS is normally required or the type for which an EIS is normally not required.[5] *Id.* § 1501.4(a). If the proposed action falls into neither category, the agency must prepare an environmental assessment ("EA"). *Id.* § 1501.4(b).

U.S.C. § 1362(12)(A)(ii). The Secretary of the Interior has generally delegated his duties under the MMPA to the Service. *See* 50 C.F.R. § 403.02(f).

5. Under NEPA, all agencies must promulgate regulations that specify (a) typical classes of actions which normally will require an EIS; (b) typical classes of actions which normally require neither an EIS nor an EA ("categorical exclusions"); and (c) typical classes of actions which normally require an EA but not necessarily an EIS. 40 C.F.R. § 1507.3(b)(2). The Department of the Interior has adopted regulations for the implementation of NEPA, including specified categorical exclusions. *See generally* 43 C.F.R. § 46.10–.450; *see also id.* § 46.210 (listing categorical exclusions).

An EA is a "concise public document" that serves to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement . . ." *Id.* § 1508.9(a)(1). An EA must include "brief discussions of the need for the proposal, of alternatives [to the proposed action] . . ., of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Id.* § 1508.9(b). If after preparing an EA the agency determines an EIS is not required and the proposed action will not have a significant effect on the human environment, the agency must issue a Finding of No Significant Impact ("FONSI"). *Id.* § 1501.4(e); *see also id.* § 1508.13.

## B. Factual and Procedural Background

On May 15, 2008, the Service published its final rule listing the polar bear as a threatened species under the ESA throughout its range. *See generally* 73 Fed. Reg. at 28,212. Concurrent with the Listing Rule, the agency also published a special rule for the polar bear pursuant to Section 4(d) of the ESA. *See generally* Special Rule for the Polar Bear, Interim Final Rule, 73 Fed. Reg. 28,306 (May 15, 2008) ("Interim Final Special Rule"); *see also* AR4D 8104–17.[6] The Secretary made this Interim Final Special Rule effective immediately. AR4D 8115. Following a 60–day comment period, on December 16, 2008, the Secretary replaced the Interim Final Special Rule with a substantially similar final rule for the polar bear. *See* 73 Fed. Reg. at 76,249; *see also* AR4D 12925–45. The Service's final Special Rule for the polar bear was subsequently codified at 50 C.F.R. § 17.40(q).

The agency's final Special Rule extends all of the take prohibitions available under Section 9 of the ESA to the polar bear, with two exceptions. First, the rule provides that none of these prohibitions will apply to any activity that is already authorized or exempted under the MMPA, the Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087, 993 U.N.T.S. 243 [hereinafter "CITES"], or both, provided that the person carrying out the activity has complied with all applicable terms and conditions. *See* AR4D 12945; 50 C.F.R. § 17.40(q)(2). In other words, under the Service's Special Rule for the polar bear, any activity that is already permitted or exempted under the MMPA or CITES will not require additional authorization under the ESA.

The Service determined that this exception is appropriate because polar bear populations in the United States were effectively managed and protected under the MMPA and CITES for thirty years prior to the publication of the Listing Rule. *See* AR4D 12938. Indeed, the agency noted, "none of the activities currently regulated under the MMPA and CITES are factors that threaten the polar bear throughout all or a significant portion of its range." AR4D 12938. Further, after comparing their relevant provisions, the agency found that "[m]any provisions . . . under the MMPA and CITES are comparable to or stricter than similar provisions under the ESA, including the definitions of take, penalties for violations, and use of marine mammals." AR4D 12937. Accordingly, the Service concluded that an additional overlay of ESA authorization procedures for activities currently permitted under the existing regulatory regime is not necessary

---

**6.** The facts in this background section are excerpted from the administrative record for the final Special Rule. Citations to the administrative record for the final Special Rule are abbreviated "AR4D."

or advisable to provide for the conservation of the polar bear:

> The comparable or stricter provisions of the MMPA and CITES, along with the application of the ESA regulations at 50 CFR 17.31 and 17.32 for any activity that has not been authorized or exempted under the MMPA and CITES . . ., address those negative effects on polar bears that can foreseeably be addressed under sections 9 and 10 of the ESA. It would not contribute to the conservation of the polar bear to require an unnecessary overlay of redundant authorization processes that would otherwise be required under the general ESA threatened species regulations at 50 CFR 17.31 and 17.32.

AR4D 12938.

Second, the Service's Special Rule provides that none of the ESA's Section 9 prohibitions will apply to any taking of polar bears that is incidental to, but not the purpose of, carrying out an otherwise lawful activity, unless that taking is caused by an activity occurring within the current range of the polar bear in the United States. *See* AR4D 12945; 50 C.F.R. § 17.40(q)(4). In other words, under the Service's Special Rule, an "incidental take" of a polar bear that is not otherwise authorized under the MMPA and is caused by an activity occurring *within* the range of the polar bear will be considered a prohibited taking under the ESA and will be subject to penalties under both statutes. By contrast, an unauthorized incidental take of a polar bear caused by an activity occurring *outside* the current range of the polar bear will not be considered a prohibited taking under the ESA and will only be subject to penalties under the MMPA.

In support of this provision, the Service explained that for activities occurring within the polar bear's range, "overlay of the incidental take prohibitions under [the ESA] is an important component of polar bear management because of the timing and proximity of potential takes of polar bears." AR4D 12937. As the agency described, future oil and gas development activities in Alaska may result in unauthorized incidental takes of polar bears that could be reduced or avoided by imposing additional penalties under the ESA. AR4D 12937–38. By contrast, the Service determined that an overlay of additional penalties and permitting procedures outside the range of the polar bear is "not necessary for polar bear management and conservation." AR4D 12938. "If it is shown that a particular activity conducted outside the current range of the species is reasonably likely to cause the incidental taking of a polar bear, whether lethal or nonlethal," the agency explained, "any incidental take that occurs is a violation of the MMPA" and, accordingly, will be subject to "the full array of the statute's civil and criminal penalties." AR4D 12930–31.

In sum, the Service generally characterized its Special Rule as follows:

> Under this final special rule, if an activity is authorized or exempted under the MMPA or CITES, we will not require any additional authorization under the ESA regulations associated with that activity. However, if the activity is not authorized or exempted under the MMPA or CITES and the activity would result in an act that would be otherwise prohibited under the ESA regulations at 50 CFR 17.31, the prohibitions of § 17.31 apply, and permits would be required under 50 CFR 17.32 of our ESA regulations. The special rule further provides that any incidental take of polar bears that results from activities that occur outside of the current range of the species is not a prohibited act under the ESA.

AR4D 12927. Accordingly, pursuant to Section 4(d) of the ESA, the Service con-

cluded that this complementary management regime is "necessary and advisable to provide for the conservation of the polar bear." AR4D 12938.

With respect to the primary threat identified in the Listing Rule—i.e., loss of sea ice habitat and related effects—the agency concluded that no additional ESA protections are necessary or advisable because that threat "would not be alleviated by the additional overlay of provisions in the general threatened species regulations ... or even the full application of the provisions in section 9 and 10 of the ESA." AR4D 12938. Indeed, the Service concluded, "[n]othing within our authority under section 4(d) of the ESA, above and beyond what we have already required in this final special rule, would provide the means to resolve this threat." AR4D 12938. In response to comments, the Service further explained, citing a policy memorandum issued by its Director on May 14, 2008, that "the future indirect impacts of individual [greenhouse gas] emitters cannot be shown to result in 'take' based on the best available science at this time." AR4D 12942.

In December 2008, plaintiffs Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace (collec-tively, "CBD") initiated an action challenging the final Special Rule.[7] CBD Third Am. Compl. ¶ 15, Docket No. 30.[8] Plaintiff Defenders of Wildlife initiated a similar action in January 2009. *See generally Defenders of Wildlife v. U.S. Dep't of the Interior, et al.*, No. 09–153 (D.D.C. Jan. 27, 2009). These cases have been consolidated before this Court, along with nine related actions, pursuant to an order of the Judicial Panel on Multi–District Litigation.[9] *See generally* Certified Copy of Transfer Order, Docket No. 1.

Plaintiffs jointly filed their motion for summary judgment on December 4, 2009. *See generally* Plaintiffs' Joint Motion for Summary Judgment on the § 4(d) Rule, Docket No. 135 ("Plfs. Mot."). The federal defendants filed their cross-motion for summary judgment on February 2, 2010. *See generally* Federal Defendants' Combined Opposition and Cross–Motion for Summary Judgment on § 4(d) Rule Claims, Docket No. 156 ("Fed. Defs. Mot."). The Court also permitted several parties to intervene on behalf of the federal defendants in support of the Special Rule. *See* Stipulation and Order Regarding Intervention, Docket No. 33, at 4–5. De-

---

7. CBD initially filed suit in the Northern District of California to compel the Service to issue its final Listing Rule for the polar bear. *See Ctr. for Biological Diversity, et al. v. Kempthorne, et al.*, No. 08–1339 (N.D.Cal. Mar. 10, 2008). After the Service issued its Listing Rule and Interim Final Special Rule on May 15, 2008, the case was subsequently transferred and assigned a new case number in this Court. *See Ctr. for Biological Diversity, et al. v. Salazar, et al.*, No. 08–2113 (D.D.C. Dec. 8, 2008). CBD's Third Amended Complaint, filed in this Court, includes claims for relief with respect to the Listing Rule as well as both the Interim Final Special Rule and the final Special Rule. Plaintiffs have abandoned as moot their claims for relief with respect to the Interim Final Special Rule. *See* Plfs. Reply at 35, n. 24. On June 30, 2011, this Court entered final judgment with respect

to CBD's Listing Rule claims. *See* Order, Docket No. 267. Accordingly, only those claims for relief relating to the final Special Rule remain to be resolved.

8. Unless otherwise specified, all references to pleadings, proceedings, hearings, opinions, and orders can be found on the Misc. No. 08–764 docket.

9. In addition to the five actions challenging the Listing Rule, which this Court has resolved, the four remaining actions in this MDL challenge the Service's refusal to issue permits for importing sport-hunted polar bear trophies under the MMPA. These four actions have been briefed separately from the Special Rule cases; therefore, the Court does not address the import ban challenges here.

fendant-intervenors grouped themselves as follows for briefing purposes:

- Alaska Oil and Gas Association, Arctic Slope Regional Corporation, and the State of Alaska (collectively, "Alaskan Intervenors"); [10]

- American Petroleum Institute, Edison Electric Institute, National Petrochemical and Refiners Association, Chamber of Commerce of the United States of America, National Mining Association, National Association of Manufacturers, and American Iron and Steel Institute (collectively, "Trade Association Intervenors").[11]

The various defendant-intervenors filed their cross-motions for summary judgment on March 26, 2010.

The Court heard arguments on plaintiffs' Special Rule claims at a motions hearing held on April 13, 2011. Following this hearing, the Court ordered the parties to file supplemental briefs on the question of remedy and related issues. *See* Minute Orders dated Apr. 15, 2011 and Apr. 19, 2011. The parties' cross-motions for summary judgment are now ripe for determination by the Court.

**10.** The Alaskan Intervenors jointly filed a cross-motion for summary judgment. *See generally* Alaskan Defendant–Intervenors' Cross–Motion for Summary Judgment on § 4(d) Rule Claims and in Opposition to Plaintiffs' Motion for Summary Judgment on Special Rule Claims, Docket No. 186 ("Alaskan Def–Int. Mot."). In addition, two of the individual Alaskan Intervenors filed separate motions for summary judgment and supplemental memoranda in support. *See generally* Defendant–Intervenor State of Alaska's Supplemental Memorandum of Points and Authorities Supporting Its and Alaskan Defendant–Intervenors' Cross–Motions for Summary Judgment and Opposing Plaintiffs' Motion for Summary Judgment on § 4(d) Rule Claims, Docket No. 188, ("State of Alaska Def–Int. Mot."); Statement of Points and Au-

## II. STANDARD OF REVIEW

Agency action challenged pursuant to the ESA is subject to judicial review under the APA. *Cabinet Mountains Wilderness/ Scotchman's Peak Grizzly Bears v. Peterson,* 685 F.2d 678, 685–86 (D.C.Cir. 1982). Under APA review, federal agency actions are to be held unlawful and set aside where they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To make this finding, a court must determine whether the agency "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made." *Keating v. FERC,* 569 F.3d 427, 433 (D.C.Cir.2009) (citing *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)).

The standard of review under the APA is a narrow one. *Citizens to Pres. Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court is not empowered to substitute its judgment for that of the agency. *Id.* This deferential standard does not, however, shield the agency from a "thorough, probing, in-depth" review. *Id.* at 415, 91

thorities in Support of Intervenor–Defendant Arctic Slope Regional Corporation's Cross–Motion for Summary Judgment on § 4(d) Rule Issues and Opposition to the Motion for Summary Judgment Filed by CBD, et al., Docket Nos. 182–83 ("ASRC Def–Int. Mot.").

**11.** The Trade Association Intervenors did not file a cross-motion for summary judgment but instead submitted supplemental memoranda in support of the federal defendants' cross-motion for summary judgment. *See generally* Memorandum of the National Trade Associations in Opposition to Plaintiffs' Motion for Summary Judgment on the § 4(d) Rule, and in Support of Federal Defendants' Cross–Motion for Summary Judgment on the § 4(d) Rule, Docket Nos. 184–85 ("Trade Assoc. Def–Int. Mem.").

S.Ct. 814. Administrative action must be invalidated as arbitrary where the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). This determination must be made solely on the basis of the record before the agency when it made its decision. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

■ Where the court reviews an agency's interpretation of a statute it is charged with administering, the Supreme Court's opinion in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* provides the appropriate framework of review. 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The first step in this review process is for the court to determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If the court concludes that the statute is either silent or ambiguous with respect to the precise question at issue, the second step of the court's review process is to determine whether the interpretation proffered by the agency is "based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. The court must defer to agency interpretations that are not "procedurally defective, arbitrary or capricious in substance, or mani-

festly contrary to the statute." *United States v. Mead*, 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (citing *Chevron*, 467 U.S. at 843–44, 104 S.Ct. 2778).

■ An agency is generally not entitled to deferential review, however, in interpreting NEPA or its regulations. *See Citizens Against Rails–to–Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150 (D.C.Cir. 2001) ("Because NEPA's mandate is addressed to all federal agencies, the [Surface Transportation Board's] determination that NEPA is inapplicable ... is not entitled to the deference that courts must accord to an agency's interpretation of its governing statute.").

## III. DISCUSSION

Plaintiffs argue that the final Special Rule for the polar bear is arbitrary, capricious, and contrary to both the ESA and NEPA. Before reaching the merits of plaintiffs' claims, the Court must first address a threshold defense raised by the Alaskan Intervenors. The Alaskan Intervenors argue that plaintiffs' ESA and NEPA claims must be dismissed, pursuant to Federal Rule of Civil Procedure 12(b)(6), because plaintiffs have not challenged a reviewable final agency action, as required by the APA.[12] The Court turns now to this defense.

### A. Whether Plaintiffs' Claims Must Be Dismissed

The Alaskan Intervenors contend that this Court must dismiss plaintiffs' ESA and NEPA claims because the provisions of the Special Rule that plaintiffs have challenged are not "final agency action" for the purposes of APA review. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and *final agency ac-*

---

12. The federal defendants have not joined in the Alaskan Intervenors' defense.

*tion* for which there is no other adequate remedy in a court are subject to judicial review." (emphasis added)); *see also Fund for Animals v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 n. 4 (D.C.Cir.2006) (failure to satisfy the APA's final agency action requirement warrants dismissal for failure to state a claim upon which relief may be granted).

 The Supreme Court in *Bennett v. Spear* established a two-pronged test for determining the finality of an agency action: (1) the action must mark "the consummation of the agency's decisionmaking process"; and (2) the action must be the type by which "rights or obligations have been determined" or from which "legal consequences will flow." 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). According to the Alaskan Intervenors, the only portion of the Special Rule that satisfies this test is 50 C.F.R. § 17.40(q)(1), the provision that actually extends the ESA's Section 9 take prohibitions to the polar bear. However, the Alaskan Intervenors argue, that provision is not at issue in this case. Instead, the Alaskan Intervenors assert that plaintiffs have only challenged the specific exceptions that are set out in 50 C.F.R. § 17.40(q)(2) and (q)(4). These provisions constitute *inaction* on the part of the agency, the Alaskan Intervenors argue, because they merely preserve the existing legal framework of the MMPA and CITES. Accordingly, the Alaskan Intervenors conclude, the challenged portions of the Service's Special Rule are not actions from which "legal consequences will flow" and do not constitute final agency action. *See* Alaskan Def–Int. Mot. at 16–17.

The Court finds this argument unpersuasive. Plaintiffs have challenged the final Special Rule for the polar bear, which constitutes final agency action under any reasonable reading of the term. It is undisputed that the final Special Rule for the polar bear represents the consummation of the agency's decision-making process and, therefore, meets the first prong of the finality test set forth in *Bennett*. The Court finds that the Special Rule also meets the second prong of the *Bennett* test. Agency regulations provide that where the Service issues a special rule for a particular threatened species, as it did here, the effect of that rule is to supersede the general regulations that otherwise apply to threatened species. *See* 50 C.F.R. § 17.31(c). The legal consequence of the Service's Special Rule, therefore, is a new regulatory regime governing management of the polar bear under the ESA. *See Bennett*, 520 U.S. at 178, 117 S.Ct. 1154 (finding that incidental take statement constituted final agency action where it "[altered] the legal regime to which the action agency is subject.").[13] Accordingly, the Court concludes that the Special Rule for the polar bear satisfies both prongs of the *Bennett* test for finality, and it declines to dismiss plaintiffs' claims on these grounds.

The Court turns now to the merits of plaintiffs' ESA claim.

---

**13.** Further, the Court cannot agree that the Special Rule does nothing more than preserve the regulatory status quo. As the Service described, under this Special Rule, "if [an] activity is not authorized or exempted under the MMPA or CITES and the activity would result in an act that would be otherwise prohibited under the ESA regulations at 50 CFR 17.31, the prohibitions of § 17.31 apply, and permits would be required under 50 CFR 17.32 of our ESA regulations." AR4D 12927. For activities occurring within the species' range, the Special Rule overlays ESA penalties and permitting procedures *on top of* the existing penalties and permitting procedures under the MMPA. The Service's Special Rule therefore expressly provides for regulatory mechanisms that are not currently available under the MMPA and CITES.

### B. Plaintiffs' ESA Claim

In its Special Rule for the polar bear, the Service found that it is necessary and advisable to extend Section 9 take prohibitions to the polar bear, but that it is not necessary for the conservation of the species to apply those prohibitions to (1) activities that are currently authorized or exempted under the MMPA or CITES; or (2) activities that are occurring outside the range of the species but may incidentally impact polar bears. The Service determined that extending limited additional ESA protections to the polar bear is particularly appropriate in light of the comparable protections available under the MMPA, which apply to activities that impact polar bears regardless of where those activities occur.

Plaintiffs claim that the Service's Special Rule fundamentally violates the ESA because it fails to provide sufficiently for the conservation of the polar bear. Plaintiffs' claim relies in large part on two threshold assumptions: first, that the plain language of the ESA requires the agency to "provide for the conservation" of threatened species; and second, that the Service cannot "reduce" the protections that would automatically apply to the polar bear under 50 C.F.R. § 17.31, which extends all Section 9 take prohibitions to all threatened species, without demonstrating a valid conservation basis for diverging from that default rule. The Court will address each of these threshold issues in turn.

### 1. Whether the Service's Special Rule Must Be Necessary and Advisable to Provide for the Conservation of the Polar Bear

Section 4(d) of the ESA reads, in relevant part:

> [W]henever any species is listed as a threatened species ... the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 9(a)(1), in the case of fish or wildlife.

16 U.S.C. § 1533(d). Plaintiffs assert that the plain language of this section establishes a strict standard that all special rules promulgated under Section 4(d) must be "necessary and advisable to provide for the conservation of [the] species." *See* Plfs. Mot. at 29.

In accordance with controlling D.C. Circuit precedent, the Court must reject plaintiffs' plain-language reading of Section 4(d), and it finds that the statute is ambiguous on this point. *See Sweet Home Chapter of Cmties. for a Great Oregon v. Babbitt,* 1 F.3d 1, 8 (D.C.Cir.1993), *modified on other grounds on reh'g,* 17 F.3d 1463 (D.C.Cir.1994), *rev'd on other grounds,* 515 U.S. 687, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) ("[T]here is a reasonable reading of § 1533(d) that would not require [the Service] to issue formal 'necessary and advisable' findings when extending the prohibitions to threatened species.... The second sentence gives [the Service] discretion to apply any or all of the [Section 9] prohibitions to threatened species without obliging it to support such actions with findings of necessity. Only the first sentence of § 1533(d) contains the 'necessary and advisable' language and mandates formal individualized findings."). However, in its Special Rule, the Service in fact adopted the standard urged by plaintiffs: "[T]he regulations promulgated under section 4(d) of the ESA provide the Secretary the discretion to determine what prohibitions, exemptions, or authorizations are *necessary and advisable* for a species, *so long as the regulation provides for the conservation of that species.*" AR4D 12937 (emphasis added). Indeed, the Service premised its Special Rule on a finding that the rule is necessary and advisable to

provide for the conservation of the polar bear.[14]

■ The Court finds that the Service's assessment of its obligations under Section 4(d), as set forth in its Special Rule for the polar bear, constitutes a reasonable and permissible interpretation of the ESA. Accordingly, the Court upholds the Service's interpretation under step two of the *Chevron* framework, and it will review the Special Rule for the polar bear pursuant to the "necessary and advisable" standard adopted by the agency.

## 2. Whether the Service Must Demonstrate a Valid Conservation Basis for Departing from 50 C.F.R. § 17.31(a)

A second fundamental premise of plaintiffs' ESA claim is that the Service cannot "reduce" the protections that would otherwise apply to the bear under the Service's general regulations for threatened species, set forth at 50 C.F.R. § 17.31(a), without demonstrating a valid conservation basis for not applying the default rule. Plaintiffs note that "for more than 30 years, it has been the Service policy and administrative practice to extend the ESA's full protections against take to threatened species as the most effective approach for ensuring their conservation." Plfs. Mot. at 30. Therefore, plaintiffs argue, any departure from this longstanding practice must have a valid conservation purpose. *See also* Plfs. Mot. at 40–41 ("Fundamentally, in order to provide a conservation 'benefit' to the polar bear, the benefits to the polar bear from the Special Rule must outweigh the benefits of any protections polar bears

would enjoy in the absence of a Special Rule.").

■ The Court finds this argument unpersuasive. Plaintiffs are correct that, in the absence of a special rule, management of the polar bear under the ESA would be governed by the general rule set out at 50 C.F.R. § 17.31(a), which extends all of the Section 9 take prohibitions to all threatened species. However, section 17.31 also authorizes the Service to issue special rules for particular species pursuant to Section 4(d). This regulation provides that where the agency chooses to issue a special rule, that rule "will contain all the applicable prohibitions and exceptions" and "none of the provisions of [paragraph (a)] ... will apply." *Id.* § 17.31(c). Nothing in the regulation, or in the ESA itself, requires the agency to demonstrate a conservation basis for *not* applying the general regulation at 50 C.F.R. § 17.31(a).

Indeed, courts have recognized that the ESA does not require regulations protecting threatened species from taking at all. Section 4(d) itself merely provides that the Secretary "*may* ... prohibit with respect to threatened species *any* act prohibited under section 9(a)(1)" (emphasis added). *See, e.g., Louisiana, ex rel. Guste v. Verity*, 853 F.2d 322, 333 (5th Cir.1988) ("In addition to this mandatory duty [to issue regulations that are necessary and advisable to provide for the conservation of the species] ..., the ESA also provides the Secretary authority to prohibit by regulation the taking of any threatened species of fish and wildlife." (emphasis omitted)); *Trout Unlimited v. Lohn*, 559 F.3d 946,

---

14. In their briefs, the federal defendants contend that the Service's Special Rule falls within the agency's broad discretionary authority under the second sentence of Section 4(d) and, therefore, the Service was not required to find that its Special Rule is necessary and advisable for the conservation of the polar bear. However, this Court can only uphold

an agency decision based on the grounds relied upon by the agency itself and not the *post hoc* rationalizations of agency counsel. *See Burlington Truck Lines v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ("[A] reviewing court ... must judge the propriety of [agency] action solely by the grounds invoked by the agency.").

962 n. 12 (9th Cir.2009) (noting that Section 4(d) does not require regulations protecting threatened species from taking and that "[t]he combination of the discretionary 'may' and the phrase 'necessary and advisable' grant [the Service] much leeway in crafting regulations"); *Defenders of Wildlife v. Kempthorne*, No. 04–1230, 2006 WL 2844232, at *2, 2006 U.S. Dist. LEXIS 71137, at *7–8 (D.D.C. Sept. 29, 2006) (noting that the Secretary may, but is not required to, extend prohibitions of Section 9 to threatened species). *See also* S.Rep. No. 93–307, at 8 (1973), 1973 U.S.C.C.A.N. 2989, 2997 ("Once an animal is on the threatened list, the Secretary has an almost infinite number of options available to him with regard to the permitted activities for those species. He may, for example, permit taking, but not importation of such activities, or he may choose to forbid both taking and importation but allow the transportation of such species.").[15]

Accordingly, the Court finds that the Service was not required to demonstrate that diverging from the general regulation at 50 C.F.R. § 17.31(a) is necessary and advisable to provide for the conservation of the polar bear. Rather, the relevant question before the Court is whether the Service reasonably concluded that the specific prohibitions and exceptions set forth in its Special Rule are necessary and advisable to provide for the conservation of the polar bear. The Court turns now to that question.

### 3. Whether the Service Reasonably Concluded that its Special Rule Is Necessary and Advisable to Provide for the Conservation of the Polar Bear

■ The ESA defines "conservation" as "the use of all methods and procedures which are *necessary* to bring any endangered species or threatened species to the point at which the measures provided … are no longer necessary." 16 U.S.C. § 1532 (emphasis added). Whereas the ESA itself prescribes certain measures that Congress deemed necessary to provide for the conservation of endangered species, Congress has generally delegated to the Secretary of the Interior the responsibility of determining what measures are necessary for the conservation of threatened species. *See WildEarth Guardians v. Salazar*, 741 F.Supp.2d 89, 105 (D.D.C.2010) ("Congress delegated to the Secretary the authority to determine the extent to which the ESA protects threatened species."). In this case, the Service determined that it is necessary and advisable to extend Section 9 take prohibitions to the polar bear but that it is *not* necessary for the conservation of the species to apply those prohibitions to activities that are currently authorized or exempted under the MMPA or CITES, or to activities that are occurring outside the range of the species that may incidentally impact polar bears.

**15.** Plaintiffs rely heavily on the Eighth Circuit's opinion in *Sierra Club v. Clark*, 755 F.2d 608 (8th Cir.1985), in which the court held that the Secretary may exercise his discretion to permit taking of a threatened species only in the "extraordinary case where population pressures within a given ecosystem cannot otherwise be relieved." *Id.* at 613. The primary question before the court in that case, however, was whether the Service could issue regulations under Section 4(d) that authorized sport hunting of a threatened species. The Eighth Circuit struck down the Service's regulation, finding that "the [ESA] on its face limits the discretion of the Secretary to allow public sport hunting of threatened species." *Id.* at 615. Here, by contrast, the Service's Special Rule does not purport to authorize sport hunting or other regulated taking of polar bears. In fact, it seeks to limit the taking of polar bears. Therefore, while *Clark* contains language favorable to plaintiffs, its holding is not on point.

Plaintiffs contend that the Service's Special Rule cannot be necessary and advisable to provide for the conservation of the polar bear because it does not address the primary threat to the species from greenhouse gas emissions and the loss of its sea ice habitat. Specifically, plaintiffs argue that the Service purposefully chose not to extend the full Section 9 take prohibitions to the polar bear "in order to ... exempt greenhouse gas emissions from the reach of the ESA." Plfs. Mot. at 33. Although it is undisputed that the Special Rule does not address greenhouse gas emissions, the Court is persuaded that the rule nonetheless survives rational basis review.

As a threshold matter, and contrary to plaintiffs' assertions, nothing in the Special Rule expressly exempts greenhouse gas emissions from regulation under the ESA or any other statute. To the extent the Service discussed greenhouse gases in the preamble to its Special Rule, the Service noted that anticipated sea ice losses as a result of greenhouse gas emissions "would not be alleviated" by an additional overlay of incidental take provisions under the ESA. AR4D 12938. The Service further explained in response to comments that "[t]here is currently no way to determine how the emissions from a specific action both influence climate change and then subsequently affect specific listed species, including polar bears." AR4D 12942. In other words, because climate modeling does not currently allow the agency to draw a causal connection between the greenhouse gas emissions from a specific source and the impact on a particular polar bear, the Service determined that it cannot identify when a "take" has occurred for the purposes of enforcing the incidental take provisions of the ESA against an individual greenhouse gas emitter. AR4D 12942 (explaining that "the future indirect impacts of individual [greenhouse gas] emitters cannot be shown to result in 'take' based on the best available science at this time.").

Accordingly, the Service concluded that even extending the full take prohibitions of the ESA to the polar bear would not effectively address the threat to the species from sea ice losses caused by global greenhouse gas emissions.

The administrative record amply supports the Service's conclusion. In a memorandum summarizing the most recent findings on this issue by the leading international climate science research organizations, the United States Geological Survey determined that "[i]t is currently beyond the scope of existing science to identify a specific source of $CO_2$ emissions and designate it as the cause of specific climate impacts at an exact location." AR4D 14144A.02. Similarly, in a memorandum to the Service, the Environmental Protection Agency Office of Air and Radiation observed that "[t]he climate change research community has not yet developed tools specifically intended for evaluating or quantifying end-point impacts attributable to the emissions of [greenhouse gases] from a single source, and we are not aware of any scientific literature to draw from regarding the climate effects of individual, facility-level [greenhouse gas] emissions." AR4D 14336. Based on these findings, the Service Director issued a subsequent policy memorandum in which he concluded that "[t]he best scientific data available today do not allow us to draw a causal connection between [greenhouse gas] emissions from a given facility and effects posed to listed species or their habitats." AR4D 14145. The Department of the Interior has echoed these conclusions in a similar policy memorandum:

> Given the nature of the complex and independent processes active in the atmosphere and the ocean acting on [greenhouse gases], the causal link simply cannot currently be made between emissions from a proposed action and specific effects on a listed species or its

critical habitat. Specifically, science cannot say that a tiny incremental global temperature rise that might be produced by an action under consideration would manifest itself in the location of a listed species or its habitat. Similarly, any observed climate change effect on a member of a particular listed species or its critical habitat cannot be attributed to the emissions from any particular source. Rather it would be the consequence of the collective greenhouse gas accumulation from natural sources and the world-wide anthropogenically produced [greenhouse gas] emissions since at least the beginning of the industrial revolution.

AR4D 14328.

Notably, plaintiffs do not contradict this record evidence. Rather, at bottom, plaintiffs' complaint appears to be that the Special Rule pre-emptively forecloses the option of citizen enforcement actions against greenhouse gas emitters in the contiguous United States. The citizen suit provision of the ESA authorizes "any person" to commence a civil suit on her own behalf to enforce certain provisions of the statute, including penalties for prohibited takings of listed species. 16 U.S.C. § 1540(g). Plaintiffs have expressed a concern that, because no incidental take of a polar bear that occurs outside the range of the species will be considered a prohibited taking within the meaning of the ESA as a result of the Service's Special Rule, no grounds exist for citizen enforcement actions against greenhouse gas emitters operating outside the range of the species in Alaska. By precluding citizen enforcement in these circumstances, plaintiffs contend, the Service has unlawfully eliminated a potentially useful tool for addressing greenhouse gas emissions and, ultimately, Arctic sea ice loss. However, although plaintiffs would undoubtedly prefer a broad citizen enforcement option, the Court is not persuaded that the Special Rule is arbitrary and capricious on these grounds.[16]

The Court is satisfied that the Service articulated a rational basis for the prohibitions and exceptions set forth in its Special Rule. The Service determined that an additional overlay of ESA permitting procedures and penalties within the range of the polar bear is necessary and advisable to provide for the conservation of the species due to the timing and proximity of potential takings of polar bears from oil and gas exploration and development activities in Alaska. Specifically, the Service concluded that ESA penalties, including citizen enforcement actions, may be necessary to avoid or otherwise reduce these direct impacts. The Service found no evidence to suggest that extending the ESA incidental take provisions outside the range of the polar bear would produce similar conservation benefits, however. With respect to these indirect impacts, in the event that an incidental take can be identified and attributed to a specific cause originating outside the species' range, the Service found that the incidental take provisions of the

**16.** The Court notes that nothing in the Special Rule would preclude a citizen suit against a greenhouse gas emitter operating without incidental take authorization *within* the range of the polar bear. Moreover, although the MMPA does not contain a citizen suit provision, nothing in the Special Rule precludes the agency itself from pursuing an enforcement action against a greenhouse gas emitter for an unauthorized incidental take of a polar bear under the MMPA, assuming a violation of that statute can be identified. Further, nothing in the Service's Special Rule prohibits the agency from taking steps to address the primary threat to the polar bear to the extent feasible within its authority under other provisions of the ESA. *See* AR4D 12939 ("[N]othing in this special rule, the MMPA, or CITES precludes us from developing and implementing a recovery plan or entering into a treaty or conservation agreement that addresses the specific threats to the polar bear as outlined in the listing rule.").

MMPA are sufficient to address that violation.[17] AR4D 12938 ("[T]he Service will pursue any violation under the MMPA for incidental take that has not been authorized, and all MMPA penalties would apply."). Accordingly, the Service concluded that an additional overlay of ESA incidental take permitting procedures and penalties outside the range of the polar bear is not necessary for the conservation of the species. The Court finds that the agency's conclusions follow from the evidence before it, and the Service has articulated a rational basis for limiting the extent of the Section 9 take prohibitions to the current range of the polar bear.

Moreover, the Court finds that the Service reasonably concluded that a complementary management regime encompassing the MMPA, CITES, and the ESA is necessary and advisable to provide for the conservation of the polar bear. The Service conducted an exhaustive analysis in which it determined that the MMPA is comparable to, or even stricter than, the take provisions of the ESA in most respects.[18] Accordingly, the Court finds that the Service reasonably chose to minimize administrative redundancy after it determined that doing so would not sacrifice significant conservation benefits. AR4D 12938 ("It would not contribute to the conservation of the polar bear to require an unnecessary overlay of redundant authorization processes that would otherwise be required under the general ESA threatened species regulations at 50 CFR 17.31 and 17.32.").[19]

---

17. Plaintiffs have argued that the Special Rule for the polar bear is arbitrary and capricious and impermissibly overbroad because it exempts not only greenhouse gases but *all* activities outside the range of the polar bear from regulation under the ESA. The Service concluded, however, that where an unauthorized incidental take of a polar bear is identified and attributed to a particular source originating outside the species' range—whether it be pesticides, chemical contaminants, or any other pollutant—the incidental take provisions of the MMPA are sufficient to address that violation. In the absence of evidence to the contrary, the Court finds that this conclusion was rational.

18. For example, the agency found that the MMPA's definition of "harassment" is more stringent than that contained in the ESA because it encompasses more activities, including "any act of pursuit, torment, or annoyance that has the 'potential to injure ... or ... to disturb'" a marine mammal, including impacts to habitat. AR4D 12927 (citing 16 U.S.C. § 1362(18)(A)). Second, the agency found that the MMPA's standard for incidental take is stricter than the standard for incidental take under the ESA because it requires no more than a "negligible impact" on the species and its habitat, whereas the ESA requires a finding that the take will not "appreciably reduce the likelihood of the survival and recovery of the species in the wild" or, for Federal actions, that the take will not "jeopardize the continued existence" of a listed species. See AR4D 12929 (comparing 16 U.S.C. § 1371(a)(5)(A)(I) to 16 U.S.C. § 1536(a)(2), 1539(a)(2)(B)). Third, the agency found that while an ESA jeopardy determination must be made at the species or subspecies level, the MMPA authorizes the agency to consider impacts at the smaller "stock" level, which allows for finer-scale protection. See AR4D 12929–30. Fourth, the agency found that the procedural requirements for obtaining an incidental take permit are stricter under the MMPA than under the ESA. See AR4D 12929. Finally, the agency found that the MMPA authorizes non-incidental take in fewer circumstances than the ESA. See AR4D 12932 (comparing 50 C.F.R. § 17.32(a) (allowing permits for zoological exhibition and educational purposes) to 16 U.S.C. § 1374(c)).

19. Plaintiffs argue that the agency should have left both the ESA and the MMPA take prohibitions in place, even where they overlap. Plaintiffs contend that the Secretary "cannot" use the MMPA as an excuse for not applying ESA protections as well. Plfs. Mot. at 41–42. The Court finds this argument unpersuasive. As discussed above, the ESA does not require the agency to extend Section 9 take prohibitions to threatened species.

In sum, having carefully considered the parties' arguments and the full administrative record, the Court finds that the Service reasonably determined that the prohibitions and exceptions set forth in its Special Rule for the polar bear are "necessary and advisable to provide for the conservation of [the] species," in accordance with Section 4(d) of the ESA. Particularly in view of Congress's broad delegation of authority to the Secretary to determine what measures are necessary and advisable to provide for the conservation of threatened species, plaintiffs have failed to carry their burden to demonstrate that the agency's conclusions were arbitrary and capricious.

The question at the heart of this litigation—whether the ESA is an effective or appropriate tool to address the threat of climate change—is not a question that this Court can decide based upon its own independent assessment, particularly in the abstract. The answer to that question will ultimately be grounded in science and policy determinations that are beyond the purview of this Court. *See Natural Res. Def. Council, Inc. v. SEC,* 606 F.2d 1031, 1053 (D.C.Cir.1979) (noting that the scope of the court's review of an agency's policy determinations is "limited to ensuring that the [agency] has adequately explained the facts and policy concerns it relied on and to satisfying ourselves that those facts have some basis in the record"); *Ethyl Corp. v. EPA,* 541 F.2d 1, 36 (D.C.Cir. 1976) ("[The court] must look at the decision not as the chemist, biologist or statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality."). The question this Court must decide is whether the agency has articulated a rational basis for the protections set forth in its Special Rule for the polar bear. For the reasons set forth above, the Court finds

that the Service has done so. Accordingly, with respect to plaintiffs' ESA claim, the Court **DENIES** plaintiffs' motion for summary judgment and **GRANTS** the federal defendants' and defendant-intervenors' motions for summary judgment.

The Court turns now to plaintiffs' NEPA claim.

### C. Plaintiffs' NEPA Claim

NEPA requires every federal agency to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.4. "Major Federal actions" are defined by regulation as "new or revised agency *rules, regulations,* plans, policies, or procedures." 40 C.F.R. § 1508.18(a) (emphasis added). Nonetheless, it is undisputed that the Service conducted no NEPA analysis for its Special Rule for the polar bear. Plaintiffs contend that this omission was unlawful.

The federal defendants raise two arguments in defense of the agency's failure to comply with NEPA. First, the federal defendants contend that rules promulgated pursuant to Section 4(d) of the ESA are generally exempt from NEPA as a matter of law, relying on long-standing Service policy and on an unpublished district court opinion from the Northern District of California. Second, the federal defendants contend that even if these special rules are not generally exempt from NEPA, the Special Rule for the polar bear in particular is not a major Federal action within the meaning of the statute and, therefore, NEPA does not apply to that rule. The Court will address each of these arguments in turn.

### 1. Whether Rules Promulgated Pursuant to Section 4(d) of the ESA Are Exempt from NEPA as a Matter of Law

According to the Service, its Special Rule for the polar bear is "exempt

from NEPA procedures." AR4D 12945. The Service assessed its duties under NEPA in the preamble to its Special Rule:

> In 1983, upon recommendation of the Council on Environmental Quality, the Service determined that NEPA documents need not be prepared in connection with regulations adopted pursuant to Section 4(a) of the ESA. The Service subsequently expanded this determination to section 4(d) rules. A section 4(d) rule provides the appropriate and necessary prohibitions and authorizations for a species that has been determined to be threatened under section 4(a) of the ESA. NEPA procedures would confuse matters by overlaying its own matrix upon the section 4 decision-making process. The opportunity for public comment—one of the goals of NEPA—is also already provided through section 4 rulemaking procedures. This determination was upheld in *Center for Biological Diversity v. U.S. Fish and Wildlife Service*, No. 04–04324 (N.D.Cal.2005).

AR4D 12945.

The federal defendants contend that the Service reasonably relied on its own policy guidance in reaching this conclusion. The Service's 1983 policy provides:

> The Fish and Wildlife Service has determined that Environmental Assessments, as defined by the National Environmental Policy Act of 1969, need not be prepared in connection with regulations adopted pursuant to Section 4(a) of the Endangered Species Act of 1973, as amended. These documents will no longer be prepared for such routine actions.[20]

48 Fed. Reg. 49,244 (Oct. 25, 1983). This policy specifies that Section 4(a) actions include "listings, delistings, reclassifica-

tions, and Critical Habitat designations." 48 Fed. Reg. at 49,244.

The federal defendants further contend that the Service reasonably relied on the Northern District of California's unpublished opinion in *Center for Biological Diversity v. U.S. Fish and Wildlife Service*, in which the district court held that special rules promulgated pursuant to Section 4(d) of the ESA are exempt from NEPA as a matter of law. No. 04–4324, 2005 WL 2000928, at *12 (N.D.Cal. Aug. 19, 2005). In *Center for Biological Diversity*, the court upheld the Service's decision not to conduct a NEPA analysis prior to issuing a special rule for the California tiger salamander under Section 4(d) of the ESA. 2005 WL 2000928, at *12. Recognizing the Service's longstanding policy of exempting its listing decisions under Section 4(a) from NEPA review, the court held that rules promulgated pursuant to Section 4(d) are also exempt from NEPA. *Id.* The court found that this exemption was appropriate because a special rule is "only triggered upon the listing" of a species as threatened, and thus falls "within the scope" of a listing decision under Section 4(a). *Id.*

This Court declines to recognize a broad exemption from NEPA for rules promulgated pursuant to Section 4(d) on the grounds put forward by the agency. In particular, the Court rejects the federal defendants' invitation to follow *Center for Biological Diversity*. Although *Center for Biological Diversity* appears to be the only case addressing the applicability of NEPA to rules promulgated under Section 4(d), that unpublished decision is not binding on this Court, and the Court does not find its reasoning persuasive.

 In reaching its conclusion, the *Center for Biological Diversity* court pri-

---

**20.** This policy also states that it is based on recommendations from the Council on Environmental Quality ("CEQ"), NEPA's implementing agency, which determined that "Sec-

tion 4 listing actions are exempt from NEPA review 'as a matter of law.'" 48 Fed. Reg. at 49,244.

marily deferred to the Service, noting that courts must defer to an agency's reasoned interpretation of its own regulations— here, the agency's 1983 policy guidance. 2005 WL 2000928, at *12. This Court finds, however, that the Service is not entitled to deference. As an initial matter, the D.C. Circuit has recognized that agencies other than CEQ are generally not entitled to deferential review in determining whether NEPA applies to a proposed action. *See Citizens Against Rails-to-Trails*, 267 F.3d at 1150 ("Because NEPA's mandate is addressed to all federal agencies, the [Surface Transportation Board's] determination that NEPA is inapplicable ... is not entitled to the deference that courts must accord to an agency's interpretation of its governing statute."). Moreover, courts are not required to defer to a regulatory interpretation that is not supported by the regulation itself. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations ... *unless it is plainly erroneous or inconsistent with the regulation.*" (emphasis added)). Here, by its terms, the agency's 1983 policy guidance only applies to rules promulgated pursuant to *Section 4(a)* of the ESA (which it defines as listings, delistings, reclassifications, and critical habitat designations). Although the Service claims that the agency has since "expanded" its 1983 policy to apply to Special Rules as well as listing rules, AR4D 12945, the Service has cited no revisions of its policy in the Federal Register, and this Court is aware of none. Accordingly, the Court finds that the agency's 1983 policy provides no substantial basis for a broad exemption from NEPA for rules promulgated pursuant to Section 4(d) of the ESA.

It is undisputed that an exemption from NEPA is necessary and appropriate for listing decisions under Section 4(a) of the ESA. *See Pacific Legal Found. v. Andrus*, 657 F.2d 829, 836–37 (6th Cir.1981) (noting that "the statutory mandate of the ESA prevents the Secretary from considering the environmental impact when listing a species as endangered or threatened [because the] Secretary is limited to using the best scientific and commercial data on the five factors listed in [Section 4(a) ]"). However, the Court disagrees with the federal defendants that rules promulgated pursuant to Section 4(d) of the ESA are necessarily exempt from NEPA because they are "triggered" by a listing decision, as the federal defendants contend. Listing decisions under Section 4(a) trigger *all* of the protective measures of the ESA, including consultation requirements under Section 7, critical habitat designations, recovery plans, take prohibitions under Section 9, and special rules for threatened species under Section 4(d). The Court is not persuaded that all of these measures are therefore exempt from NEPA review. Indeed, this Court and others have recognized that many of these actions require NEPA analysis. *See, e.g., Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir.1996) (finding NEPA analysis required for an incidental take statement); *Fund for Animals v. Hall*, 448 F.Supp.2d 127, 136–37 (D.D.C. 2006) (finding NEPA analysis required for Section 7 consultation); *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of the Interior*, 344 F.Supp.2d 108, 134 (D.D.C. 2004) (finding NEPA analysis required for critical habitat designation under Section 4 of the ESA).

Finally, the Court finds wholly unpersuasive the federal defendants' argument that rules promulgated pursuant to Section 4(d) are exempt from NEPA review because they are subject to the notice-and-comment rulemaking procedures of the APA, which sufficiently furthers the goals of NEPA. *See* Fed. Defs. Mot. at 47 (citing *Douglas Cnty. v. Babbitt*, 48 F.3d 1495,

1506 (9th Cir.1995) ("We ... find that NEPA does not apply to the designation of a critical habitat because the ESA furthers the goals of NEPA without demanding an EIS.")). As plaintiffs point out, under the federal defendants' approach, *any* rule-making properly carried out under the APA would therefore be exempt from NEPA, because the APA always requires the opportunity for public comment before finalizing a rule. An exception of such staggering breadth would render NEPA meaningless.[21]

For the foregoing reasons, this Court concludes that rules promulgated pursuant to Section 4(d) of the ESA are not exempt from NEPA as a matter of law. Accordingly, the Court declines to uphold the Service's decision to forgo NEPA review on these grounds.

**2. Whether the Special Rule for the Polar Bear is Exempt from NEPA Because it is Not a "Major Federal Action Significantly Affecting the Quality of the Human Environment"**

Whereas in the Special Rule itself the Service relies wholly on a conclusion that all rules promulgated pursuant to Section 4(d) are exempt from NEPA as a matter of law, in their briefs the federal defendants argue that even in the absence of a general exemption, NEPA nonetheless does not apply to the Special Rule for the polar bear in particular, because it is not a "major Federal action significantly affecting the quality of the human environment." According to the federal defendants, the Special Rule is not a "major Federal action" because it does not change the regulatory status quo. Rather, the federal defendants assert, the rule largely leaves in place the existing management regime for the polar bear under the MMPA and CITES, and it extends only limited additional protections to the polar bear under the ESA. The federal defendants argue, in addition, that the Special Rule for the polar bear does not "significantly [affect] the quality of the human environment" because the rule will have no impact on the physical environment. The Court finds that it cannot uphold the Service's decision to forgo NEPA review on any of these grounds.[22]

---

**21.** The Court further notes that exemptions from NEPA are available only in certain limited circumstances. First, the Supreme Court has held that an agency may be exempt from NEPA where requiring the agency to prepare an EIS would "create an irreconcilable and fundamental conflict with the Secretary's duties" under another statute. *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 788, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976). The D.C. Circuit has also recognized an exemption from NEPA where another statute requires the "functional equivalent" of a NEPA analysis. *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 384 (D.C.Cir. 1973); *see also Envtl. Def. Fund v. EPA*, 489 F.2d 1247, 1256 (D.C.Cir.1973). The federal defendants do not argue that either exemption applies in this case.

**22.** The federal defendants further argue that NEPA does not apply to the Special Rule for the polar bear because it actually provides a "conservation benefit" to the species. *See* Fed. Def. Mot. at 44–45. The Court finds this argument unpersuasive. As a threshold matter, the D.C. Circuit has not recognized an exception to NEPA on these grounds. Moreover, the cases cited by the defendants recognize an exemption from NEPA only where the action in question provides a *general* benefit to the environment. By contrast, the primary focus of the Service's Special Rule is to provide for the conservation of the polar bear. *See Catron Cnty. Bd. of Comm'rs v. U.S. Fish and Wildlife Serv.*, 75 F.3d 1429, 1437 (10th Cir.1996) ("While the protection of species through preservation of habitat may be an environmentally beneficial goal, [agency] action under ESA is not inevitably beneficial or immune to improvement by compliance with NEPA procedure.").

Even assuming the federal defendants are correct, the Special Rule is not therefore exempt from NEPA review. NEPA requires every federal agency to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment"; however, the statute and its implementing regulations also dictate the process by which an agency determines whether an EIS is required. First, the agency must determine whether its proposed action is the type for which a full EIS is normally required, or whether it is the type for which a full EIS is normally not required (a "categorical exclusion").[23] *See* 40 C.F.R. § 1501.4(a). If the proposed action falls into neither category, NEPA directs the agency to prepare an EA that provides "sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* §§ 1501.4(b), 1508.9(a)(1). Here, it is undisputed that the Service did not prepare an EA for its Special Rule. Accordingly, the Court finds that the Service failed to comply with its obligations under NEPA. *See Catron Cnty. Bd. of Comm'rs*, 75 F.3d at 1437 ("[W]e believe Congress intends that the Secretary prepare an EA leading to either a FONSI or an EIS.").

The Court does not conclude at this stage that the Service was required to prepare a full EIS. Notwithstanding the arguments the federal defendants make in their briefs, the Service itself made no findings as to whether its Special Rule constitutes a "major Federal action significantly affecting the human environment." This Court cannot draw those conclusions on the agency's behalf based solely on the arguments of counsel. *See Comm. for*

*Auto Responsibility (C.A.R.) v. Solomon*, 603 F.2d 992, 1003 n. 46 (D.C.Cir.1979) ("To ensure the agency's understanding of the statutory standards and its adequate consideration of the problem, we deem it important that *the agency* state its reasons for not preparing an EIS." (emphasis added)).

For the foregoing reasons, the Court is persuaded that the Service erred when it failed to conduct any NEPA review prior to issuing its Special Rule for the polar bear. Accordingly, with respect to plaintiffs' NEPA claim, the Court **GRANTS** plaintiffs' motion for summary judgment and **DENIES** the federal defendants' and defendant-intervenors' motions for summary judgment.

### D. Remedy

The APA directs that a court "shall ... set aside" any agency action found to be "arbitrary, capricious, ... or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Both the Supreme Court and the D.C. Circuit have held that vacatur is the presumptive remedy for this type of violation. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case."); *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C.Cir.2001) ("[A plaintiff who] prevails on its APA claim ... is entitled to relief under that statute, which normally will be a vacatur of the agency's order."). Having found that the Service violated NEPA and the APA in promulgating its final Special Rule for the polar bear, this Court con-

---

**23.** Apart from a conclusory assertion by the Trade Association Intervenors that the Special Rule for the polar bear falls within the Department of the Interior's categorical exclusion for regulations that are "legal ... or procedural" or whose environmental impacts are too "speculative, or conjectural," no party has substantially argued that rules promulgated pursuant to Section 4(d) of the ESA qualify for any categorical exclusion recognized by agency regulation. *See* Trade Assoc. Def–Int. Mem. at 24 (citing 43 C.F.R. § 46.210(i)).

cludes that vacatur and remand of the final Special Rule is the appropriate remedy here. *See Am. Bird Conservancy, Inc. v. FCC,* 516 F.3d 1027, 1034–35 (D.C.Cir. 2008) (vacating and remanding agency decision for NEPA and ESA violations).

 When an agency replaces an existing regulation with a new regulation, and the Court vacates all or part of the new regulation, the Court must decide "whether the agency's prior regulation continues in effect or whether [its] action leaves no regulation in effect." *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 553 (D.C.Cir.1983); *see also Fund for Animals v. Norton,* 294 F.Supp.2d 92, 115 (D.D.C.2003) (vacating 2003 snowmobile rule and leaving in place the modified 2001 snowmobile rule). Here, the December 16, 2008 final Special Rule for the polar bear replaced the Interim Final Special Rule, which was given immediate effect on May 15, 2008. Although plaintiffs argue that the Interim Final Special Rule for the polar bear should not be reinstated because it suffers from the same legal flaws as the final Special Rule, the Court finds this argument unpersuasive. The Interim Final Special Rule is not before this Court on review and, therefore, this Court cannot issue an advisory opinion as to its lawfulness. Accordingly, the Court concludes that the effect of vacating the final Special Rule for the polar bear will be to reinstate the rule previously in force. The May 15, 2008, Interim Final Special Rule for the polar bear shall remain in effect until further Order of the Court.

In their supplemental briefs, the federal defendants note that the Service is willing to commit to a schedule for completion of remand. *See* Fed. Def. Supp. Mem. on Remedy, Docket No. 263, at 21. The Court agrees that a schedule for completion of remand is advisable. In light of plaintiffs' concerns about the Interim Final Special Rule, the Court is sensitive to the need for remand to be completed as expeditiously as possible. By no later than November 17, 2011, the parties are directed to submit a joint proposed timetable to the Court addressing the length of time within which NEPA review shall be completed. In the event that the parties are unable to reach an agreement on a joint recommendation, each party shall submit an individual recommendation by that time. The Court shall withhold issuance of its Order vacating and remanding the final Special Rule to the Service pending resolution of this issue.

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is hereby **GRANTED IN PART** and **DENIED IN PART**, the federal defendants' cross-motion for summary judgment is hereby **GRANTED IN PART** and **DENIED IN PART** and the defendant-intervenors' cross-motions for summary judgment are hereby **GRANTED IN PART** and **DENIED IN PART.** This Court shall withhold its Order vacating and remanding the December 16, 2008, final Special Rule pending the resolution of a timetable for the completion of NEPA review on remand. Upon vacatur of the December 16, 2008 final Special Rule, the prior May 15, 2008, Interim Final Special Rule shall remain in effect until further Order of the Court.

An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**